FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STANLI MAE THROCKMORTON
TERBUSH; JAMES W. TERBUSH, Heirs
at law and successor in interest;
PETER JAMES TERBUSH, Decedent,
            *Plaintiffs-Appellants,*

            v.

UNITED STATES OF AMERICA,
            *Defendant-Appellee.*

No. 06-15033

D.C. No.
CV-02-05509-SMS

OPINION

Appeal from the United States District Court
for the Eastern District of California
Sandra M. Snyder, Magistrate Judge, Presiding

Argued and Submitted
November 6, 2007—San Francisco, California

Filed February 21, 2008

Before: Ferdinand F. Fernandez and M. Margaret McKeown,
Circuit Judges, and David G. Trager,[1] Senior Judge.

Opinion by Judge McKeown

---

[1]The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

## COUNSEL

John Douglas Barr, Bar & Mudford, Redding, California; and William O. Davis, Old Station, California, for the plaintiffs-appellants.

Peter D. Keisler, Assistant Attorney General, McGregor W. Scott, United States Attorney, Mark B. Stern and Isaac J. Lidsky, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., for the defendant-appellee.

## OPINION

McKEOWN, Circuit Judge:

This case illustrates the intersection of the National Park Service's ("NPS") mandate to open federal park lands for recreational use, the scope of NPS's obligation to provide for visitor safety, and the risks of mountain climbing. In 1999, Peter Terbush was killed by a rockslide in Yosemite National

Park ("Yosemite") while climbing Glacier Point. His family filed claims under the Federal Tort Claims Act, 28 U.S.C. § 2671-2680 (the "FTCA"), claiming that it was not a freak accident and that the NPS is responsible for creating unsafe conditions and failing to warn of the hazards it created. The district court dismissed for lack of subject matter jurisdiction on the ground that the NPS's actions fell within the discretionary function exception to the FTCA. We agree with the district court's analysis with respect to the failure to warn claims and those regarding the design and construction of the wastewater facilities, but the record is insufficient to rule as a matter of law on the Terbushes' maintenance claims, and so we reverse and remand on this issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 1999, Terbush was killed while climbing with two friends at Yosemite's Glacier Point Apron. Three weeks earlier, another rockfall led park staff to temporarily close the Glacier Point Apron area and the nearby Curry Village campground. The closure was lifted less than three hours after inspection, when the area was declared to be safe by a park ranger and James B. Snyder, the Yosemite historian who, though not a professionally trained geologist, had been documenting rockfalls at Yosemite for decades. Terbush's climbing partners claim that when they went to Glacier Point Apron three weeks later, none of them saw any warnings about the recent rockfall.

Terbush's parents brought suit under the FTCA, 28 U.S.C. § 1346(b), alleging that NPS's negligence in its design, construction, operation, and maintenance of the wastewater management system on top of Glacier Point Apron exacerbated the natural exfoliation of the rockface, creating a dangerous condition that led to the rockfall that killed their son. The Terbushes also alleged that the NPS failed to warn of the dangerous condition it had created, which was an unnatural and unseen hazard to visitors. The United States denied the allega-

tions, asserted various defenses and filed a motion to dismiss or, in the alternative, a motion for summary judgment on the ground that the court lacked subject matter jurisdiction under the discretionary function exception to the FTCA. Magistrate Judge Sandra M. Snyder granted the motion to dismiss and declared the motion for summary judgment moot.

We review *de novo* the district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction under the discretionary function exception. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002). In reviewing the district court's dismissal, we must accept as true the factual allegations in the complaint. *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 327 (1991)). The United States bears the burden of proving the applicability of the discretionary function exception. *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).

## II. ANALYSIS

### A. THE FEDERAL TORT CLAIMS ACT FRAMEWORK

[1] The FTCA waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment. The government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

[2] The FTCA includes a number of exceptions to this broad waiver of sovereign immunity, including the oft-litigated "discretionary function exception," which provides immunity from suit for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In this way, the

discretionary function exception serves to insulate certain governmental decision-making from "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

The Supreme Court in *Berkovitz v. United States* set out a two-step analysis to determine applicability of the exception. *See Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). First, we must determine whether the challenged actions involve an "element of judgment or choice." *Gaubert*, 499 U.S. at 322. This inquiry looks at the "nature of the conduct, rather than the status of the actor" and the discretionary element is not met where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee "has no rightful option but to adhere to the directive." *Id.*

When a specific course of action is not prescribed, however, an element of choice or judgment is likely involved in the decision or action. We then must consider "whether that judgment is of the kind that the discretionary function exception was designed to shield," namely, "only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 536-37. Public policy has been understood to include decisions "grounded in social, economic, or political policy." *Varig*, 467 U.S. at 814. Even if the decision is an abuse of the discretion granted, the exception will apply. *See* 28 U.S.C. § 2680(a); *Soldano v. United States*, 453 F.3d 1140, 1145 (9th Cir. 2006).

The distinction between protected and unprotected actions and decisions has proven itself to be a particularly vexing

determination for district and appellate courts alike. As we noted recently, governmental actions "can be classified along a spectrum, ranging from those 'totally divorced from the sphere of policy analysis,' such as driving a car, to those 'fully grounded in regulatory policy,' such as the regulation and oversight of a bank." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (quoting *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002)). Courts have been reluctant to create formulaic categories or to demarcate flashpoints on this spectrum to illuminate which governmental decisions fall within the discretionary function exception. *See GATX/ Airlog Co.,* 286 F.3d at 1174 ("Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged."); *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (noting the Supreme Court's rejection of "analytical frameworks" as "inappropriate means of addressing the discretionary function exemption.").

The Supreme Court underscored this point in *Gaubert*, when it rejected a bright line between planning and operational functions. *See Gaubert*, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level. '[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.' ") (quoting *Varig*, 467 U.S. at 813). In *Gaubert*, a shareholder of an insolvent savings and loan association brought suit alleging negligent supervision of directors and officers and negligent involvement in day-to-day operations by federal regulators. *Id.* at 319-20. In clarifying its prior treatment of the issue, the Court rejected the plaintiff's reliance on a misunderstanding of the law that created convenient, but false, distinctions: The Court noted that the Court of Appeals had "misinterpreted" *Berkovitz* to "perpetuat[e] a nonexistent dichotomy between discretionary functions and operational activities. . . ." *Id.* at 326.

**[3]** Instead of a rigid dichotomy between "planning" and "operational" decisions and activities, the Court in *Gaubert*

adopted a different rule: "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324. Thus, "[w]hen established governmental policy, as express or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.*

Under *Gaubert*, for a complaint to survive a motion to dismiss, it must "allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be *grounded in* the policy of the regulatory regime." *Id.* at 324-25 (emphasis added). The Court clarified, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

## B.   APPLICATION OF THE DISCRETIONARY FUNCTION EXCEPTION TO THE TERBUSHES' CLAIMS

**[4]** Before discussing the Terbushes' specific claims, as an initial matter we note that the authority for the NPS's work is grounded in the Organic Act, 16 U.S.C. § 1, which sets forth the broad policy considerations that govern the NPS's management of national parks. The Organic Act states the NPS's purpose is "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Much of the NPS's work is "grounded" in the Organic Act's broad mandate to balance conservation and access. *See, e.g., Childers v. United States*, 40 F.3d 973, 975 (9th Cir. 1994). However, we do not quickly accept that every minute aspect of the NPS's work is touched

by the policy concerns of the Organic Act. *Cf. Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997) (rejecting government's argument that national security concerns were implicated in a decision of whether to install a staircase or bar passage down an embankment on a naval base). Accordingly, we must analyze each of the claims in light of the applicable policies and the Organic Act.

The Terbushes allege a collective failure by the NPS to provide for the safety of visitors to Glacier Point. They claim that once the NPS undertook to develop facilities atop Glacier Point, it could not do so negligently, either in the design, construction or maintenance of the facilities, or in the failure to warn the public of hazards. Specifically, they argue that the NPS was aware of the hidden hazard posed by the unnatural exfoliation of Glacier Point Apron by the wastewater management system, but failed to adequately ameliorate the problem through appropriate maintenance or warn the public of the hidden hazard they had effectively created. The Terbushes' arguments amount to a "perfect storm" theory wherein the NPS's various failings over several decades built upon one another, making Peter Terbush's death inevitable and, in their view, preventable by the NPS.

The government counters that the NPS's decisions and actions were discretionary ones grounded in the policy regime established by the Organic Act. The government also contests the Terbushes' portrayal of the NPS policies, arguing that they do not create mandatory and specific duties, but rather vest the NPS with considerable discretion in their implementation. Pointing to our case law, the government claims that these discretionary decisions are "susceptible" to policy analysis and are therefore immune from our review.

### 1. Design, construction, and maintenance of the wastewater system

The Terbushes claim that the NPS's negligent design, construction and maintenance of the wastewater facilities atop

Glacier Point exacerbated the natural exfoliation of Glacier Point Apron, thereby creating an unseen hazard to climbers like Peter Terbush. Our case law teaches, however, that design matters involve discretionary decisions by government actors. *See, e.g., Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1027 (9th Cir. 1989); *Chaffin v. United States*, 176 F.3d 1208, 1210 (9th Cir. 1999) (discretionary function exception "renders the government immune from a negligence claim for [a] design decision [in the construction of a cabin]"). In light of this obstacle, the Terbushes counter that they are not asserting a faulty design claim, but rather their claim is about the NPS's "failure to implement mandated safety reviews" prior to the construction of the facilities atop Glacier Point and ongoing maintenance after construction. We agree with the district court's detailed analysis that the various NPS policies do not contain mandatory and specific directives to which the NPS had "no rightful option but to adhere," *Berkovitz*, 486 U.S. at 536, and that these decisions were "grounded" in the policy regime established by the Organic Act.

### a. 1988 Management Policies—Impairment, safety and hazard reviews

[5] We do not read the policies cited by the Terbushes to contain mandatory and specific provisions dictating that impairment, safety and hazard "reviews" must occur in the manner they describe, and note that sections of the policies to which they cite vest considerable discretion in the NPS that is clearly grounded in the broad mandate to balance conservation with access and safety.

[6] For example, the 1988 Management Policies apply to all national parks and guide policy that "sets the framework and provides direction for management decisions" that are to be made by managers and superintendents, who are to "ascertain park-specific purposes and management direction." The Management Policies state that "[w]ide variations exist in the

degree to which the laws and proclamations creating the individual units of the national park system prohibit or mandate specific management actions." Although the policies "generally allow for management discretion . . . they are mandatory where the language so indicates."

More specifically, the so-called "impairment review" described by the Terbushes is explicitly recognized as involving a decision by the superintendent that calls for reconciling the "inevitabl[e] . . . tension between conservation of resources on the one hand and public enjoyment on the other." This reconciliation calls for judgment on the part of the NPS:

> [w]hether an individual action is or is not an 'impairment' is a management determination. In reaching it, the manager should consider such factors as the spatial and temporal extent of the impacts, the resources being impacted and their ability to adjust those impacts, the relation of the impacted resources to other park resources, and the cumulative as well as the individual effects.

This provision is not a mandatory and specific policy, and the language itself implicates the NPS's broader mandate to balance access with conservation.

**[7]** Nor do the 1988 Management Policies explicitly call for safety and hazard "reviews." While the document states that facilities "will not be located" in areas where natural processes, including "geologic conditions," pose a persistent threat "unless no practicable alternative site exists and unless all safety and hazard probability factors have been considered," nowhere is there an explicit call for a safety and hazard "review." Rather, "[w]here facilities must be located in such areas, their design and siting will consider the nature of the hazard and include appropriate mitigating measures to minimize the risks to human life and property." Unlike wetlands

and floodplains, for which the NPS elsewhere provides further requirements to be met prior to development, no further requirements are provided for mitigation measures relating to "geologic conditions." Absent further mandatory and specific directives, in constructing the facilities atop Glacier Point, the NPS is left to balance its various policy mandates of access, safety and conservation.

### b.   Maintenance of wastewater management system

Recognizing the absence of mandatory standards vis-a-vis design, the Terbushes shift the focus of their claim arguing that "[t]he gravaman of [their] reasoning goes not to facility design and location" but to "the operation and maintenance of the [wastewater] system," which they claim was negligent. The Terbushes also claim that the magistrate judge "ignored the existence of NPS-50 [the 1991 Loss Control Management Guidelines], OSHA standards and Park-specific policies and failed to recognize that "maintenance is not the kind of policy weighing decision automatically provided immunity." The government responds that because the Terbushes cannot point to any mandatory or specific requirements for the repair and maintenance of the facilities, "the first prong of the discretionary function analysis is not at issue."

[8] It is true that the magistrate judge did not analyze the maintenance claims in the same detail as the other claims.[2] Nonetheless, we agree with the government that absent a mandatory and specific policy dictating otherwise, we are left to assume that the maintenance of the wastewater management system is a discretionary function. Analyzing the main-

---

[2]In regards to maintenance, the magistrate judge simply wrote: "The policies concerning the siting and maintenance of wastewater facilities state broad policy objectives and refer to competing policy considerations. There is no mandatory, specific policy that required particular action of any NPS agent in connection with the death of decedent." It is unclear which policies are referenced in this finding.

tenance claims under the second *Berkovitz* prong is, however, a bit more complicated.

We must determine whether such maintenance work would involve protected policy judgments. The focus of our inquiry is "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Relying on a footnote in *Whisnant*, the government argues the maintenance decisions clearly implicate the NPS's policy regime. Citing *Bear Medicine*, *Whisnant* summarized: "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. . . ." *Whisnant*, 400 F.3d at 1182 (quoting *Bear Medicine v. United States*, 241 F.3d 1208, 1215 (9th Cir. 2001)). The opinion goes on to state in a footnote:[3]

> Our case law reveals one exception—not relevant here—to the design/implementation distinction: The implementation of a government policy *is* shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire.

*Id.* at 1182 n.3.

According to the government, the maintenance of the wastewater system is clearly within the exception in *Whisnant*. Thus, like firefighters needing to consider public safety and their own safety in battling forest fires, *see Miller v. United States*, 163 F.3d 591, 595-96 (9th Cir. 1998), prison

---

[3]The court distinguished its new rubric from the planning/operational distinction rejected by *Gaubert* by noting that "the former [design/implementation] concerns the nature of the decision, while the latter [planning/operational] concerns the identity of the decisionmaker." *Id.* at 1181 n.1.

guards who must balance prisoner safety and their own safety in searching prisoners' cells in response to a reported threat, *see Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002), or the FAA's efforts to oversee compliance with federal safety regulations, *see GATX/Airlog*, 286 F.3d at 1175-77, the government contends that the maintenance of the wastewater system implicates the policy concerns of the regulatory regime of the Organic Act and other policies.

It is a long leap from routine maintenance of a wastewater system to fighting forest fires and guarding prisoners. The decisions and actions in the cases highlighted by *Whisnant* appear to involve far more than mere maintenance (indeed, what unites them are safety considerations), which returns our focus to the "nature" of the actions and decisions in question here.

**[9]** Our case law directs that, by nature, matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy-weighing decisions or actions. *See Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007) (observing that snow removal from a parking lot is "maintenance work," which is " 'not the kind of regulatory activity' to which the Supreme Court envisioned the discretionary function exception applying") (quoting *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987)). For example, in *Whisnant*, we confronted a clear case of maintenance failure: claims against a naval commissary for failing to eradicate a mold problem in its meat department. *See Whisnant*, 400 F.3d at 1181.

**[10]** Looking to other circuits, we observe that sometimes "maintenance" is far from routine and may involve considerable discretion that invokes policy judgment. *See, e.g., Mitchell v. United States*, 225 F.3d 361, 364 (3d Cir. 2000) (noting that repairing roadside wall involved balancing several policy considerations); *Baum v. United States,* 986 F.2d 716, 723-24 (4th Cir. 1993) (noting that maintenance could be accom-

plished only by "outright *replacement*," and was thus a decision about "how and when to replace a major element of a substantial public facility" that implicated economic and political policy, i.e., allocation of funds); *Cope*, 45 F.3d at 451 (observing that further repairs of a road required NPS to prioritize among its repairs and to "establish priorities for the accomplishment of its policy objectives against such practical considerations as staffing and funding.") (quoting *Varig*, 467 U.S. at 820).

**[11]** Though our own case law frowns upon the government relying solely on fiscal policy and budgetary constraints as the "protected" policy considerations protected by the exception,[4] *Cope* and *Baum* nonetheless lend support to the government's arguments by substantiating the *possibility* that particular maintenance activities, unlike cleaning out mold from a store, as in *Whisnant*, or re-paving a road to precise specifications, as in *ARA Leisure*, can involve more than initially meets the eye. If the maintenance of the wastewater facilities turned out to involve a balancing of policy considerations, more complex decisions or outright replacement, as in *Baum*, these decisions would tend to implicate the broader mandates of the NPS's policy regime.

The difficulty here is that we cannot determine on the record before us whether the challenged maintenance at issue

---

[4] *See, e.g., O'Toole*, 295 F.3d at 1037 ("Every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources. . . . Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly."); *Whisnant,* 400 F.3d at 1184 ("we decline to permit the government to use the *mere presence* of budgetary concerns to shield allegedly negligent conduct from suit under the FTCA") (emphasis added). *But see Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1421-22 (9th Cir. 1997) (reconciling disparate holdings and concluding that only "[w]here a statute or policy plainly requires the government to balance expense against other desiderata, then considering the cost of greater safety is a discretionary function.").

is maintenance that falls beyond policy judgments or whether it tends to the other end of the spectrum, which implicates broader mandates of NPS's policy regime. Merely establishing that the boundaries of maintenance are discretionary is not sufficient.

Although we recognize *Gaubert*'s presumption of actions taken in furtherance of a regulatory regime's goals to be "grounded" in the policy of the regulatory regime, and are aware that we do not need actual evidence of policy-weighing in any given decision, there still must be some support in the record that the decisions taken are "susceptible" to policy analysis for the discretionary function exception to apply. On this point, the government bears the burden. It is not sufficient for the government merely to waive the flag of policy as a cover for anything and everything it does that is discretionary in nature. "Consideration of tenets that sweep so broadly is of little use in the application of the discretionary function exception." *Gotha*, 115 F.3d at 181 (declining to see the Navy's mission to "provide a defense to the Nation or to enforce its diplomatic efforts" implicated in a decision to install a handrail on a staircase). Indeed, if all that were required were a bald incantation of "policy," then such an approach would swallow the second prong of *Berkovitz*.

In reviewing the extensive and varied case law in this circuit and elsewhere, we decline to adopt a rule that would eviscerate the original purpose of the statute by an overly-generous reading of the policy-based prong of the exception. As we noted in *O'Toole*, the FTCA was created by Congress with the intent "to compensate individuals harmed by government negligence," and as a "remedial statute," it "should be construed liberally, and its exceptions should be read narrowly." 295 F.3d at 1037 (citing *Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir. 1976)). Although much time has passed, we should not forget the Supreme Court's early observation that in adopting the FTCA, Congress sought to prevent the unfairness of allowing "the public as a whole" to benefit

"from the services performed by Government employees," while allocating "the entire burden" of government employee negligence to the individual, "leav[ing] him destitute or grievously harmed." *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957).

[12] Because the parties and the district court to some degree lumped the question of maintenance together with the other claims regarding design and construction, we cannot determine whether the government met its burden to prove the applicability of the exception as a matter of law. Accordingly, we remand for further proceedings on this issue.

### 2.   Failure to warn of hazards

The second major claim relates to a failure to warn of the rockfall hazard. Recognizing that identification of a mandatory duty is a threshold requirement, the Terbushes point us to two documents: 1) the 1991 Loss Control Management Guidelines, NPS-50 ("NPS-50"), which, they argue, required the "park safety officer" to conduct site inspections and write an incident report following accidents involving the public, and dictated that following the May 1999 rockfall, Curry Village should have been closed and warning signs posted; and 2) the 1993 Resource Management Plans ("1993 Plans"), which, they argue, required the creation of a geologic hazard education program that would educate the public about known potential dangers.

Before turning to the specifics of those documents, we review our case law on warnings. Most of our cases in the post-*Gaubert* era have held that fulfilling the NPS's decision to warn the public of hazards in the national parks entails the kind of policy weighing decision protected from judicial review by the discretionary function exception.

[13] We have interpreted the broad mandate of the Organic Act, as well as NPS-50, to call upon the NPS to "balance

access with safety, and take into account conservation and resources in designing area plans," in determining the safety of particular areas, and choosing the "precise manner" in which to warn the public of any hazards. *Childers*, 40 F.3d at 975-76. As noted in *Childers*, such decisions are "precisely the kind the discretionary function exception was intended to immunize from suit." *Id.* at 976. *See also Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (NPS officials must employ their "discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety") (quoting *Childers*, 40 F.3d at 926); *Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (the "broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards.") (citing *Valdez*, 56 F.3d at 1180); *Faber v. United States*, 56 F.3d 1122, 1127 (9th Cir. 1995) (distinguishing specific policies in Forest Service plans from the "general operating procedures" in *Childers*, which required the NPS to "weigh public access against visitor safety.") (citing *Childers*, 40 F.3d at 974).

Despite the wealth of cases underscoring that safety decisions by the NPS are the ultimate policy-driven discretionary exercise, we acknowledge that our case law may not be in complete harmony on this issue, which is perhaps the inevitable result of such a policy-specific and fact-driven inquiry. For example, the Terbushes argue that their case is like *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), where we held that a failure to warn was not protected by the discretionary function exception. In *Summers*, a child was injured while walking barefoot on hot coal remnants of a beach fire that were left within a fire ring. Summers claimed the NPS had been negligent in warning of the hazard posed by the hot coals. The court concluded that there was "no evidence . . . that NPS's failure to post warnings . . . was the result of a

decision reflecting the competing considerations of the Service's sign policy," and held that the Park Service's failure to identify and warn of the danger of the hot coals "resemble[d] more a departure from the safety considerations established in Service policies . . . than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors." *Id.* at 1215-16.

The Terbushes overlook, however, that courts since *Summers*, which was decided before *Gaubert*, have marginalized its importance. To begin, *Summers* has been distinguished on its facts. *See, e.g., Blackburn*, 100 F.3d at 1432 (observing that, unlike in *Summers*, the NPS did have to consider policy issues in identifying hazards and choosing how to warn). We also distinguished *Summers* in *Lesouer*, noting that while *Summers* may have only involved "safety consideration under an established policy, rather than the balancing of competing policy considerations," other cases could be more complicated. *Lesouer v. United States*, 21 F.3d 965, 970 (9th Cir. 1994). Such a case presented itself in *Faber*, where we elaborated upon *Lesouer* and limited application of the discretionary function exception to situations "where the government was required to engage in broad policy-making activities or to consider unique social, economic, and political circumstances in the course of making judgments related to safety." 56 F.3d at 1125.

**[14]** As in *Blackburn*, we also distinguish *Summers* from the present case. Whereas the court in *Summers* stated that there was no evidence[5] that the NPS's failure to post warnings

---

[5]Of course, after *Gaubert* we do not need actual evidence that policy-weighing was undertaken. *See Gaubert*, 499 U.S. at 324-25. Other courts have also limited *Summers'* impact on this very basis. *See, e.g., Rosebush v. United States*, 119 F.3d 438, 443-44 (6th Cir. 1997) (noting that the rationale in *Summers* was rejected the following year in *Gaubert* and conflicts with Sixth Circuit case law); *see also* Donald N. Zillman, *Protecting Discretion: Judicial Interpretation of the Discretionary Function Exception to the Federal Tort Claims Act*, 47 ME. L. REV. 365, n.94 (1995) (observing that this portion of *Summers'* holding is "probably invalid" after *Gaubert*).

"was the result of a decision reflecting the competing considerations of the Service's sign policy," here, in contrast, the mandates of access, conservation and safety were at issue in the NPS's decisions in identifying the scope of the rockfall hazard as well as the appropriate means of warning the public. The district court correctly observed that "the more fundamental defect with Plaintiffs' argument is that the decision cannot be boiled down to a simple recognition of the existence of some hazard. The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion." As in *Childers, Valdez* and *Blackburn*, this process of identifying and responding to hazards in the wild implicates the NPS's broader policy mandates to balance access with conservation and safety. *Summers*, then, appears out of step with our other NPS failure to warn cases decided post-*Gaubert*.

### a.   NPS-50

**[15]** Turning to the specific policies that the Terbushes claim mandated particular actions by the NPS, we observe that NPS-50 is designated as "Management Guidelines" that have wide application to all territory under NPS control. Reading through the document, one is hard pressed to find any mandatory requirements applicable here. That discovery should be no surprise in light of the document's intended role as a policy guideline. The guidelines are also largely inapplicable to the rockfall activity at Glacier Point Apron because the rockface is not an NPS "facility" or "operation," nor was the event here an "employee accident" covered by the guidelines.

**[16]** The first chapter of NPS-50 states that the program objectives of the NPS's Safety and Occupational Health Program include "[p]roviding for the safety and health of the public (visitors) from recognized hazards in NPS operations, on NPS lands, and in NPS facilities . . . ." The Terbushes fix-

ate on the phrase, "on lands," to argue that the NPS-50 includes a natural rockface like Glacier Point, but this general language must be read within the context of the document as a whole, which is reasonably interpreted to apply to all facilities and operations, not natural rock features.

[17] We agree with the district court's findings that "these provisions are not reasonably interpreted to apply to recreational activities at rock faces, which are not NPS 'facilities or operations.' " It is easy to see how a definition as expansive as the Terbushes posit is impractical in light of the difficulties in "inspecting" and "abating" hazards in the millions of acres of open space, wilderness and vast terrain over which the NPS exercises authority.[6] Nor do we agree with the Terbushes' interpretation of the NPS-50 as applicable to non-employee accidents. Thus, even the provisions of Chapter 22 of the NPS-50, which explicitly relate to visitor safety, suffer from both shortcomings: they relate to inspection of employee-caused accidents in NPS "workplaces," "facilities" or "operations."

Accordingly, the Terbushes' assertion that the park safety officer was required to be involved in the inspection of any incidents of rockfall activity glosses over both the fact that the Glacier Point Apron is not a "facility," an "operation," or a "workplace," and the fact that the May 1999 rockfall was not an "employee accident[ ]/incident[ ]" in the language of the guidelines.

The second deficiency of the Terbushes' claims is that NPS-50 vests park officials with considerable discretion in

---

[6]For example, Chapter 5 indicates that "[e]very NPS facility, operation and/or workplace, including employee housing, shall be formally inspected annually. More frequent inspections will be conducted when there is an increased risk of accidents." It then elaborates examples of those facilities to be inspected more frequently, such as those "used for overnight accommodations and group gatherings."

determining the appropriate scope of investigations and warnings, as is evident from the overall nature of the NPS-50 as a broad set of guidelines and the more specific references to inspection of hazards. The introduction to NPS-50 explicitly states that it is a "guideline" that has been prepared to provide "field units and office managers" with enough information "to develop a comprehensive safety and occupational health program," but that "each area must design its own safety and occupational health effort based on local circumstances and operations."

**[18]** Contrary to the Terbushes' suggestion, the statement in Chapter 1 that "requirements in this document are mandatory unless otherwise stated," cannot alone convert otherwise discretionary decisions into specifically mandated prescriptions for action or criteria for decision making. *See Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.") (citing *Chamberlin v. Isen*, 779 F.2d 522, 525 (9th Cir. 1985)). This wide-ranging policy manual is one of general application providing individual park managers with broad policy guidelines that the Department of Interior expects them to elaborate with park-specific policies.

The same can be said of the more specific "requirements" cited by the Terbushes. The clearest statement of the duty to inspect accidents is repeated in several places, notably in Chapters 6 and 22, which reiterate the same language: "All accidents should be investigated, including accidents involving property damage only. The extent of such investigations shall reflect the seriousness of the accident or of the potential for reoccurrence." There can be little doubt that this provision is discretionary on its face.

Even Chapter 22, which directs NPS policy towards the visiting public, does not contain mandatory and specific provisions that rob the NPS of discretion. This section contains

the broad directive that "the NPS region and park should establish a public safety program that minimizes the potential for injury, illness, death and/or property damage to the public while they are visiting NPS facilities," and also includes a section entitled, "Educational Materials, Signs, Programs," where it states that "[a]ll areas will provide any special materials, signs and programs to alert the public of potential dangers."

The broad nature of these provisions stands in sharp contrast to the park safety provisions in *Faber*, which the Terbushes argue controls our decision. In *Faber*, Faber dove approximately twenty feet from a rock ledge, sustaining injury. Prior to the accident, the Forest Service had promulgated several "site management plans" for the Tanque Verde Falls, one of which required it to "develop a sign plan, formulate an on-going media program to inform the public, and provide a presence at the Falls to verbally warn the public, enforce the laws, and record use patterns." 56 F.3d at 1123-24. None of these specific steps were taken before the accident. We held that the discretionary function exception did not apply because one of the plans "listed three specific and mandatory measures that the Forest Service was to take in order to increase safety at the Falls." *Id.* at 1126. We added, "[b]ecause the challenged conduct . . . was in direct contravention of a specifically prescribed federal policy, the discretionary exception does not apply." *Id.*

**[19]** Our most recent failure to warn case is also instructive. In *Navarette v. United States*, 500 F.3d 914 (9th Cir. 2007), we held the Army Corps' failure to warn campers of a dangerous "drop-off" to be in contravention of a mandatory and specific policy to warn visitors of such dangerous terrain conditions. Significantly, unlike here, the policy in *Navarette* explicitly listed drop-offs as a hazardous terrain condition that required warning. *Id.* at 918-19. In contrast, as here, the NPS had to exercise its discretion in determining the extent of the rockfall hazard and the appropriate response to it. The kinds

of decisions involved in making this assessment are protected by the exception. *See Alfrey*, 276 F.3d at 565 (the exception "protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive.") (quoting *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000) (emphasis omitted). Similarly, the NPS's decision to close Glacier Point and the extent to which it later chose to warn about rockfalls at Glacier Point were discretionary judgments as well.[7]

[20] The Terbushes' claim at heart is that the NPS should have done more following the May 1999 rockfall to warn the public, but this is precisely the kind of determination that is protected from our review. But in the context of this case, *Childers, Valdez,* and *Blackburn* all protect from judicial review NPS decisions determining the scope of hazards and the appropriate means to alert the public to the danger they pose. *Cf. Elder v. United States*, 312 F.3d 1172, 1183-84 (10th Cir. 2002) (questioning what could ever "constitute an adequate warning," and noting that park management must "judge the totality of the safety package in terms of its impact on other public policies besides safety."). Under the *Gaubert* standard, the decisions made at Yosemite about warning the

---

[7]The Terbushes argue that the rockfall hazards had been identified since at least 1980, when the 1980 General Management Plan recommended removal of the Curry Village cabins. They argue further that the failure to remove the cabins was a violation of a mandatory and specific policy calling for their removal. We cannot find any mandatory or specific directives within that plan, which is a broad visionary document foreseeing developments at Curry Village and elsewhere in Yosemite over "approximately" ten years at "estimated costs" of over $150 million. Indeed, the document refers to itself as "propos[ing]," rather than mandating, a shift in the location of some of the present facilities. Creating and executing a multi-million dollar development plan not only involves an element of choice, but it also involves the balancing of the kinds of policy considerations exempted by the discretionary function exception. "The presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Sabow*, 93 F.3d at 1453 (citing *Chamberlin*, 779 F.2d at 525).

public were "grounded" in the NPS's policy regime. *See Gaubert*, 499 U.S. at 325.

### b. Resource Management Plan—Hazard Education Program

The other policy cited by the Terbushes is the 1993 Resource Management Plan, which they claim mandated a one-year period for implementing a geologic hazards education program based on the observation that "there exist serious geologic hazards to human safety along park roads and in Yosemite Valley in particular." Notably, the introductory paragraph on "Management Objectives," states: "[t]hese management objectives are used *to guide* the development of the management strategies, action plans, and project statements in subsequent sections of the Resource Management Plan." (emphasis added). Thus, while a specific time-frame of one year is mentioned in the section addressing geologic hazards, viewed in its proper context, the one-year time frame is not mandatory as it falls within a chapter on "objectives," i.e., broad goals meant to "guide" park managers in implementing the management plan, and thereby calling upon them to continue to exercise their discretion in implementing the plan in the various subject areas it addresses.

[21] Even if the one-year deadline were viewed as a mandatory and specific directive, the NPS retained discretion in how to implement this directive, which would necessitate further decisions and actions protected by the discretionary function exception. *See, e.g., Miller*, 163 F.3d at 595 (standards and procedures did outline certain requirements for fire suppression, but did "not eliminate discretion because they do not tell firefighters how to fight the fire," i.e., in a "specific manner and within a specific period of time."). As the court in *Miller* noted, "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Id.* Accordingly, we do not read the provisions calling for a

hazard education program to create a mandatory and specific duty, and conclude that the discretion the NPS had in implementing this program is "susceptible" to the policy considerations of the regulatory regime established by the Organic Act.

**AFFIRMED IN PART; REVERSED IN PART and REMANDED.** Each party shall bear its own costs on appeal.