Opinion by Judge BEA; Dissent by Judge B. FLETCHER.
*858 OPINION
BEA, Circuit Judge:
On Memorial Day weekend 2005, Joseph Bailey rowed his boat over a submerged dam on the Yuba River in Northern California. The boat foundered, and Bailey drowned. The Army Corps of Engineers (“the Corps”) had placed signs warning of the dam, mid-river upstream of, and on the banks near the dam. However, recent heavy river flows had washed the signs away. Four days before Bailey met his sad fate, the Corps had attempted to replace the warning signs, but had judged that the Yuba was so turbulent as to threaten the safety of its workers who had to ford the river to attach new signs and buoys.
Bailey’s widow and children brought suit claiming the government was negligent in the Corps’ failure to place the warning signs.
The district court granted a motion to dismiss the Baileys’ complaint on grounds the Federal Torts Claims Act (“FTCA”) provided the government immunity from suit under the facts alleged and shown, because the decision not to place the warning signs on account of worker peril was a discretionary decision commended by Congress for decision by the Corps, not to be second-guessed by a court or jury.
Mrs. Bailey and her children appeal. We conclude the discretionary function exception to liability applies. The district court acted correctly, and we affirm.
I. Facts and Procedural Background.
The Daguerre Point Dam is a submerged,[1] debris-control dam on the Yuba River in Northern California that is managed and operated by the Army Corps of Engineers (“the Corps”). The Corps’s management duties include posting signs to warn recreational boaters that the dam presents a hazard. In 1987, the Corps promulgated the Sign Standards Manual (“SSM”). The SSM tells the Corps how “to provide appropriate signs and markers at each project to guide, inform, and protect visitors and employees.” With respect to sign maintenance and replacement, the SSM requires “that damaged signs be reported as soon as the problem is noticed so that the necessary maintenance work can be scheduled and completed in a timely manner.” The SSM further states that “[i]t is also critical that missing or damaged signs be replaced or repaired in a timely manner.” However, the SSM also declares that, “[personnel safety is a prime concern in performing sign maintenance.”
Although the 1987 SSM provides guidelines regarding warning signs, it does not dictate the placement of signs at any given location operated by the Corps. Rather, it states that “[ejxisting conditions must be evaluated on a site-by-site basis followed by the development of a sign plan using the signs and engineering criteria contained in this section.” Pursuant to this SSM language, the Corps developed a sign plan for the Daguerre Point Dam that specifies exactly where warning signs should be placed along the Yuba River upstream from the dam, as well as a sign inventory that contains specific details about each sign. The sign plan requires placement of several permanent signs, such as signs on the dam abutments that say “Danger-Keep Back,” signs that say “Raft Portage,” and a sign four miles upstream that says “Warning-Submerged Dam 4 Miles Downstream.” Because of increased river usage in the spring and summer months, the sign plan also calls for seasonal warning signs to be placed *859 along the south bank of the Yuba River and on a mid-river sand bar downstream of the four-mile warning sign. The Corps also installed a mid-river warning buoy.
Installing the signs on the sand bar and installing the buoy are the most difficult tasks of sign-posting because they require Corps workers to navigate the river. Installing the sand bar signs requires the workers to drive two trucks through the river to the sandbar; installing the buoy requires a worker to wade out into the river and anchor it underwater. Thus, to replace any signs, conditions on the river have to be safe, and the water flow and water levels have to be low enough to allow workers to do this.
In late April 2005, the Corps installed these seasonal warning signs. However, around May 19, 2005, there were unexpectedly heavy water flows on the Yuba River, and soon thereafter, the Corps learned that the warning signs had been submerged or washed away. On May 25, 2005, Corps workers went to the river to assess if it was possible to replace the signs. They could not get to the location where the signs had been placed because of the high, fast water and dangerous river conditions.
On May 29, 2005, during Memorial Day Weekend, Joseph Bailey took his two sons rafting on the Yuba River, starting approximately six miles upstream of the Daguerre Point Dam. There were no warning signs about the dam anywhere upriver of the dam; there were only warning signs on the dam abutments. These came too late. Bailey and his sons went over the dam; the two sons survived, but Joseph was caught in the spill water and drowned. The next day, the Corps replaced the missing signs.
Joseph Bailey’s survivors brought suit on his behalf against the Corps under the Federal Tort Claims Act. In their complaint they alleged the Corps negligently failed to replace the missing warning signs before the busy Memorial Day weekend. The Corps moved for summary judgment, or alternatively to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The district court held that the discretionary function exception shielded the Corps from suit, and therefore granted the Corps’s motion to dismiss for lack of subject matter jurisdiction. This appeal timely followed.
II. Standard of Review.
We review de novo the district court’s decision to grant a motion to dismiss for lack of subject matter jurisdiction under the discretionary function exception. Terbush v. United States, 516 F.3d 1125, 1128 (9th Cir.2008). The United States bears the burden of proving the applicability of the discretionary function exception. Id.
III. Analysis.
The FTCA waives the federal government’s sovereign immunity for tort claims arising out of the negligent conduct of government employees and agencies in circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred. Id. at 1128-29. However, the discretionary function exception provides the government an immunity from suit that private persons do not have: for “[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a).
*860 The discretionary function exception is a limit placed by Congress on its waiver of traditional sovereign immunity from suit; it “marks the boundary between Congress’ willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.” Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). “The basis for the discretionary function exception was Congress’ desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.” Id. at 536-37, 108 S.Ct. 1954 (quotation marks omitted).
The Supreme Court has created a two-step test for courts that governs the applicability of this exception. Terbush, 516 F.3d at 1129. The first step is to determine whether a federal statute, regulation, or policy mandated a specific course of action,[2] or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action. Id. If the government action did involve choice or judgment, the second step is to determine “whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy.” Id. (quotation marks omitted). If the challenged action or omission satisfies these two prongs, the government is immune from suit based on that action or omission — and federal courts lack subject matter jurisdiction — even if that action or omission constituted an abuse of discretion or was a wrong choice under the circumstances. Id.
A. The first step: the Corps had to exercise its judgment to determine when to replace the missing signs; nothing mandated a specific time for replacement.
An agency does not retain discretion whether to act where a statute or policy directs mandatory and specific action and the agency has no lawful option but to adhere to the directive. Navarette v. United States, 500 F.3d 914, 916 (9th Cir.2007). On the other hand, an agency retains discretion whether to act where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task. Miller v. United States, 163 F.3d 591, 595 (9th Cir.1998). In Miller, the plaintiff sued the United States Forest Service under the FTCA for its allegedly negligent handling of a forest fire that spread from the Ochoco National Forest onto Miller’s property and caused damage. Id. at 592. The district court granted the Forest Service’s motion for summary judgment on the ground the discretionary function exception applied. Id. We affirmed. Id.
We held the first prong of the discretionary function exception was met because there were “no specific directives that mandate[d] specific action in a multiple fire situation.” Id. at 595. Although there were general firefighting guidelines, those guidelines “[did] not eliminate dis *861 cretion because they ... did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time.” Id[3]
Likewise here, no regulation or guideline required the Corps to replace the missing signs before a busy weekend or within a specific period of time after receiving notice the signs were gone. The Corps’s sign manual states only “that missing or damaged signs must be replaced or repaired in a timely manner.” (Emphasis added.) Although this does strip the Corps of its discretion whether to replace missing or damaged signs,[4] it does not create a mandatory and specific directive regarding when the Corps must replace any missing or damaged signs. Rather, the determination of when to replace the signs is left to the discretion of the Corps.
Once an agency has discretion with respect to the challenged action, we must move on to step two. This is because the discretionary function exception provides immunity even to abuses of discretion. 28 U.S.C. § 2680(a). Here, the Corps had discretion to determine what constituted “timely” replacement of the missing warning signs. Therefore, the first prong of the discretionary function exception is met and we move on to the second step.
B. The second step: the timeliness decision is susceptible to policy analysis.
Only discretionary decisions that are susceptible to public policy analysis confer immunity on the government under the FTCA; “[t]he challenged decision need not be actually grounded in policy considerations.” Miller, 163 F.3d at 593. So, even though the Corps retained discretion to decide when to replace the missing signs, it could still be liable for a negligent decision unless its decision is susceptible to a public policy analysis. See id. at 595. “Public policy has been understood to include decisions grounded in social, economic, or political policy.” Terbush, 516 F.3d at 1129 (quotation marks omitted).
We have noted that, although an agency’s decision to adopt certain safety precautions as opposed to others may be based in policy considerations, generally, “the implementation of those precautions is not. Safety measures, once undertaken, cannot be shortchanged in the name of policy.” Whisnant v. United States, 400 F.3d 1177, 1182 (9th Cir.2005) (alterations omitted). However, “[t]he implementation of a government policy is shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire.” Id. at 1182 n. 3 (citing Miller, 163 F.3d at 595-96).[5]
*862 In Miller, we held that the implementation of a government safety program with respect to fighting forest fires did require the agency to balance competing policy interests, and thus, the discretionary function exception applied. We noted that “the Forest Service’s decision regarding how to attack a fire involved balancing considerations including cost, public safety, firefighter safety, and resource damage.” 163 F.3d at 595. We then held that “[t]hese considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect.” Id. Thus, when a decision requires an agency to balance competing safety considerations, that decision is susceptible to a policy analysis. See id. at 596 (“Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision.”).
As with the Forest Service’s decision in Miller, the Corps’s decision here regarding when to replace the missing signs on the Yuba River required the Corps to balance competing policy interests. The Corps had to balance the safety of its workers and the risk to its other limited resources, i.e., its equipment, in replacing the signs in dangerous conditions against the competing public safety interest in having the signs replaced sooner. Indeed, the record establishes that Corps “[s]taff attempted to assess the situation on May 25, 2005, but could not get to the location where the signs had been placed either on the gravel/sand bar or on the South banks of the river because of the high, fast water and dangerous conditions.” So, as in Miller, although the Corps was implementing a safety program when it was deciding when to replace the washed-out signs, in doing so it had to balance competing policy interests: the safety of boaters and the safety of its sign-placing workers and their equipment. Therefore, under the discretionary function exception, the Corps’s discretionary decision as to when to replace the signs is susceptible to policy analysis and is immune from suit.
Although the dissent correctly contends that safety considerations generally are not policy considerations, it ignores our law that establishes that balancing competing safety considerations is a protected policy judgment.[6] See id. The *863 dissent is correct that in Miller there were other types of policy considerations in addition to safety that went into the Forest Service’s discretionary judgment about how to fight the forest fire, but that does not detract from Miller’s holding that balancing competing safety considerations is a policy judgment. Moreover, so long as a decision involves even two competing interests, it is “susceptible” to policy analysis and is thus protected by the discretionary function exception. See Alfrey v. United States, 276 F.3d 557, 565 (9th Cir.2002) (holding that “[a] prison official’s judgment about how extensively to search a cell involves a balancing of the potential risk [from the reported threat], on the one hand, against the inmate’s interest in being free from overly intrusive searches, on the other,” and that this balancing was sufficient to immunize the government from plaintiffs claim that the guards negligently searched his cell). Here, the competing interests the Corps had to balance in determining when to replace the missing warning signs were public safety versus Corps worker safety, as well as the safety of its equipment in the fast river. Thus, the Corps’s decision regarding when to replace the missing warning signs is susceptible to policy analysis and is immune as a basis of suit.
In hindsight it may be easy to say the Corps should have replaced the signs sooner, but that is exactly the judicial second-guessing of government decision-making that the discretionary function exception is designed to prevent. As we stated in Miller, “[o]ur task is not to determine whether the Forest Service made the correct decision in its allocation of resources. Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision.” 163 F.3d at 596. The Corps had to balance competing policy interests in deciding when to replace the missing signs. Therefore, immunity shields its decision.
AFFIRMED

. A submerged dam is not visible upstream because the dam’s structure is under water.

. State tort law duties are not relevant to the determination whether the discretionary function exception applies. See Mitchell v. United States, 787 F.2d 466, 468 (9th Cir.1986) ("Mitchell argues that 'BPA was without discretionary authority to breach the duty of care imposed by Washington law.’ Negligence, however is irrelevant to the discretionary function issue.”). It is only after we determine as a matter of federal law that the discretionary function exception does not apply that we then evaluate whether the government can be held liable under the laws of the state where the act or omission took place. See 28 U.S.C. §§ 1346(b) and 2680(a).

. As discussed more fully below, we also held that the Forest Service’s decisions regarding how to fight a forest fire were susceptible to policy analysis. Miller, 163 F.3d at 595-96.

. The Corps did replace the missing signs on May 30, 2005.

. Whisnant sued the government under the FTCA. 400 F.3d at 1179. He alleged the government had negligently failed to discover and abate a mold problem in the commissary of one of its naval bases and that he contracted pneumonia as a result. Id. The government filed a Rule 12(b)(1) motion to dismiss on the ground the suit was barred under the discretionary function exception. Id. at 1180. The district court granted the motion. Id. On appeal, we reversed. Id. at 1185. We held that, “removing an obvious health hazard is a matter of safety, not policy.” Id. However, we implied that inspecting the commissary did not involve balancing competing safety considerations — there was no claim, nor was *862 there any evidence that inspection for mold posed a risk to agency personnel, nor any evidence such risk was considered by the agency. Id. at 1182 n. 3.

. The dissent cites Faber v. United States, 56 F.3d 1122, 1125 (9th Cir.1995) and Whisnant for the proposition that safety considerations are not policy considerations. Although those cases did deal with government safety programs, the implementation of those programs did not involve balancing competing safety considerations. Weighing two competing safety interests and making a decision in favor of one interest or the other is a protected policy judgment. See Whisnant, 400 F.3d at 1182 n. 3 ("The implementation of a government policy is shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing firefighter safety and public safety considerations.... ” (emphasis added)); Miller, 163 F.3d at 596 ("Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision.” (emphasis added)). The dissent contends that we are relying on this footnote in Whisnant— which the dissent characterizes as "dicta” — to overrule the holding of Whisnant. That is simply not the case. Whisnant held that the government’s failure to discover mold at a naval commissary, which it was required to inspect — although no statute, regulation or policy prescribed the precise manner in which the commissary was to be inspected— was not susceptible to policy analysis. 400 F.3d at 1183. The footnote merely contrasts Whisnant’s holding by recognizing the holding of Miller: a decision that requires an agency to balance competing safety considerations is protected by the discretionary function exception. It also recognizes that the *863 holding of Miller did not apply to the facts in Whisnant; that is, the government’s failure to discover mold at the commissary during its safety inspections did not involve the balance of competing safety considerations. There was no evidence that mold inspectors place themselves at risk when inspecting mold. Here, the Corps's decision when to replace the missing signs did require it to balance competing safety considerations. Thus, nothing in our opinion today conflicts with Whisnant.