**WOODWARD STUCKART, LLC, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Case Nos. 2:11–cv–00322–SU, 2:11–cv–00323–SU.**

United States District Court, D. Oregon.

Sept. 30, 2013.

Richard W. Goeken, Alan I. Saltman, Smith, Currie & Hancock LLP, Washington, DC, Gregory J. Miner, Bateman Seidel Miner Blomgren Chellis & Gram, PC, Portland, OR, for Plaintiffs.

Kevin C. Danielson, U.S. Attorney's Office, Sean E. Martin, U.S. Attorney's Office, District of Oregon, Portland, OR, for Defendant.

### OPINION AND ORDER ADOPTING FINDINGS AND RECOMMENDATION

MICHAEL H. SIMON, District Judge.

United States Magistrate Judge Patricia Sullivan issued Findings and Recommendation in these two consolidated cases on April 9, 2013. Dkt. 72. Judge Sullivan recommends that Defendant's Motions to

Dismiss (Dkt. 14 in Case No. 2:11–cv–00322–SU) and (Dkt. 13 in Case No. 2:11–cv–00323–SU) be granted for lack of subject matter jurisdiction, based on the application of sovereign immunity. The Court agrees.

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objections to a magistrate's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.;* Fed. R.Civ.P. 72(b)(3).

For those portions of a magistrate's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn,* 474 U.S. 140, 152, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report[.]"); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003) (*en banc*) (the court must review *de novo* magistrate's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[ ] *sua sponte* ... under a *de novo* or any other standard." *Thomas,* 474 U.S. at 154, 106 S.Ct. 466. Indeed, the Advisory Committee Notes to Fed.R.Civ.P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate's recommendations for "clear error on the face of the record."

## DISCUSSION

Plaintiffs timely filed objections to Judge Sullivan's Findings and Recommen-

dation (Dkt. 80), to which Defendant responded (Dkt. 87), and Plaintiffs filed a reply (Dkt. 93). Plaintiffs object to Judge Sullivan's recommendation that the discretionary function exception to the waiver of sovereign immunity applies to the conduct involved in these cases and that the cases should be dismissed. The Court has reviewed *de novo* Judge Sullivan's Findings and Recommendation, as well as the briefing and new evidence submitted by the parties. The Court agrees with Judge Sullivan's reasoning and conclusion that the discretionary function exception to the waiver of sovereign immunity applies in these cases.

The facts of these cases are set out in Judge Sullivan's Findings and Recommendation. Briefly, these cases involve a lightning-caused fire in the Bridge Creek Wilderness that was allowed to burn naturally as a wilderness fire for approximately nine days until it suddenly escalated. Suppression efforts were unable to contain it within the wilderness area, and it burned Plaintiffs' properties. In their objections, Plaintiffs argue that Defendant was negligent in many of the decisions made in handling this fire, including designating the fire as a wilderness fire, maintaining that designation for approximately nine days, and making certain chain-of-command delegations and decisions, including determining the personnel managing the fire. As noted by Judge Sullivan, courts routinely find that the decisions of the United States relating to fighting forest fires are discretionary and subject to the discretionary function exemption to the waiver of sovereign immunity. Plaintiffs fail to show that the decisions in these cases are distinguishable in any meaningful way.

Plaintiffs submitted new evidence with their objections to the Findings and Rec-

ommendation. The Magistrate's Act permits a court to "receive further evidence" at its discretion. 28 U.S.C. § 636(b)(1); *see also United States v. Howell,* 231 F.3d 615, 621 (9th Cir.2000) (discussing the Circuit split on whether a district court must or may consider new evidence when reviewing *de novo* a magistrate judge's findings and recommendation, and concluding that a district "has discretion, but is not required" to consider new evidence). Here, Plaintiffs explain that they believed they would be able to submit additional briefing to the Magistrate Judge following oral argument, and the Court exercises its discretion to consider the new evidence. The new evidence, however, does not save Plaintiffs' claims.

The new evidence submitted by Plaintiffs is offered primarily to support their objection that the Magistrate erred in not finding that because the Fire Use Management Team ("FUMT") that arrived at the Bridge Creek Fire had a trainee Operations Section Chief, fire suppression must be implemented. Plf's Obj. at 16–19. The new evidence clarifies that the desired Operations Section Chief for an FUMT is an Operations Section Chief Type 2. This evidence does not, however, support Plaintiffs' argument that there is a genuine issue of fact[1] that if an FUMT does not have an Operations Section Chief Type 2, discretion is removed from the Forest Service in managing a fire as a wilderness fire and suppression activities must commence immediately. First, as discussed at length by Judge Sullivan, the directions described in the publications relied on by Plaintiffs are discretionary. F & R at 1220–22. Second, the provisions cited by Plaintiffs do not mandate any particular response to a situation where the FUMT does not have

an Operations Section Chief Type 2, let alone mandate that fire suppression must immediately begin.

For Plaintiffs' remaining objections, Plaintiffs cite to various clauses in Forest Service guidelines and other publications, emphasizing certain isolated language, to argue that the Forest Service personnel violated various "mandatory" provisions. Plaintiffs conclude that because of these provisions, the Magistrate Judge erred in applying the discretionary decision exemption because the Forest Service "simply had no authority (let alone discretion) to allow the Bridge Creek fire to continue burning." Obj. at 2. Dkt. 80.

The Court agrees with Judge Sullivan's reasoning and conclusion that Plaintiffs fail to create an issue of fact that the cited provisions are mandatory such that they remove the requisite discretion of Defendant in managing the fire, and more importantly, that any violation of the alleged "mandatory" provisions require that fire suppression must commence immediately and that the Forest Service can no longer manage the fire as a wilderness fire. F & R at 1220–22. By way of example, Plaintiffs argue that the Magistrate Judge erred because there is an issue of fact as to whether the Agency Administrator signed the signature table each day of the fire. Plf's Obj. at 11–12. Assuming without deciding that Plaintiffs raise such an issue of fact, they cite to no statutory or regulatory provision or other authority creating an issue of fact that any such failure by the Agency Administrator to sign the signature table requires the Forest Service to stop managing the fire as a wilderness burn and start suppression activities. *See* F & R at 1224–25.

---

1. Judge Sullivan correctly applied the summary judgment standard in considering Defendant's factual attack on jurisdiction because in this case issues relating to jurisdiction and the underlying merits are intertwined. *See* F & R at 1216–17.

## CONCLUSION

The Court ADOPTS Judge Sullivan's Findings and Recommendation (Dkt. 72). Defendant's Motions to Dismiss (Dkt. 14 in Case No. 2:11–cv–00322–SU and Dkt. 13 in Case No. 2:11–cv–00323–SU) are GRANTED. These cases are dismissed.

**IT IS SO ORDERED.**

## FINDINGS AND RECOMMENDATION

SULLIVAN, United States Magistrate Judge:

Plaintiffs Woodward Stuckart, LLC, Craig Woodward, Lucy Woodward, Michael Stuckart, and the Cole Brothers, Inc. bring this consolidated action against defendant the United States, through the Department of Agriculture and the Forest Service, alleging negligence under the Federal Tort Claims Act ("FTCA"). Defendant moved to dismiss plaintiffs' complaints for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). For the reasons set forth below, defendant's motion to dismiss should be granted and this case should be dismissed.

## BACKGROUND

The case arises out of a challenge to defendant's actions in managing a forest fire ("Bridge Creek Fire" or "Fire") in the Ochoco National Forest. In July 2008, the Ochoco National Forest approved a wildland fire use ("WFU") guide, which describes how fires within designated wilderness areas may be identified and managed as natural burns for resource benefit. *See* Walter Decl. Ex. A, at 5. On August 7, 2008, lighting caused a small fire within Bridge Creek area, which is an area pro-

tected under the Wilderness Act, 16 U.S.C. § 1331 *et seq. See* Cole Brothers, Inc. Compl.[1] ("Compl.") ¶¶ 2, 8–10; *see also* Walter Decl. ¶¶ 5–6; Def.'s Mem. in Supp. of Mot. Dismiss 5 n. 2. Several other fires were also ignited by thunderstorm that day within the Ochoco National Forest. *Id.*

On August 8, 2008, Forest Supervisor/Agency Administrator Jeff Walter approved WFU management for the Fire and prepared Stage I of the Wildland Fire Implementation Plan ("WFIP"). *See* Compl. ¶ 28; Walter Decl. ¶¶ 6–7 & Ex. B; Letz Decl. ¶ 9. On August 10, 2008, Forest Service personnel performed an on-the-ground survey of the Fire. *See* Walter Decl. Ex. B, at 19–22; *see also* Hearing Transcript at 34. On August 12, 2008, the Bridge Creek Fire was "no more than .25 acres in size"; because the Fire was still actively burning, Walter conducted a Stage II WFIP, which approved continued WFU management. Compl. ¶¶ 41–46; *see also* Walter Decl. ¶ 10 & Ex. E. Also on August 12, 2008, Walter ordered a Fire Use Management Team to assist with all of the WFU fires that were burning within the Ochoco National Forest, including the Bridge Creek Fire. *See* Walter Decl. ¶ 11.

On August 14, 2008, Walter delegated management of the Ochoco National Forest fires to Incident Commander Matthew Reidy. *Id.* at ¶ 12; Reidy Decl. ¶ 8. That same day and with input from Reidy, Fire Staff Officer Craig Letz, and District Ranger William Queen, Walter approved an updated Stage II WFIP, which revalidated WFU management of the Bridge Creek Fire. *See* Walter Decl. ¶ 13 & Ex. G. Additionally, pursuant to that assessment,

---

1. Cole Brothers, Inc. filed a separate complaint from Woodward Stuckart, LLC, Craig Woodward, Lucy Woodward, and Michael Stuckart. Plaintiffs' complaints are substantively identical; as such, plaintiffs' actions were consolidated in order to determine whether this Court had subject-matter jurisdiction. *See* Minutes of Proceedings (Nov. 10, 2011).

Walter determined that moving to a Stage III WFIP was appropriate. *Id.* Walter and Reidy also identified Road # 450, which separates federal wilderness areas from private land, as the maximum manageable area boundary for the Bridge Creek Fire. *Id.* As of August 14, the Fire remained "very small," approximately .25 acres in size. *Id.;* Compl. ¶ 49.

On August 15, 2008, Walter left the area to transport his daughter to college in Kentucky. Walter Decl. ¶ 15. Prior to his departure, Walter designated District Ranger Queen as his representative and acting Fire Supervisor. *See* Queen Decl. ¶ 9. Thereafter, Reidy and Queen flew over the Bridge Creek Fire in a helicopter and observed it to be two to three acres in size. *Id.* at ¶ 10; Reidy Decl. ¶ 11; Compl. ¶ 54. During and/or after the flight, Queen decided to continue WFU management and signed a Periodic Fire Assessment. *See* Queen Decl. ¶ 10 & Ex. A; Reidy Decl. ¶ 11. As a contingency measure, Reidy and Queen decided to create a firebreak along Road # 450. *See* Queen Decl. ¶ 11; Reidy Decl. ¶ 11. That evening, fire conditions worsened; the fire behavior forecast called for a Haines[2] of 5 and included a "red flag warning" in effect from midnight on August 15, 2008 through August 17, 2008. *See* App. to Pls.' Resp. to Mot. Dismiss ("Pls.' App.") 28–30.

Beginning on the morning of August 16, 2008, Forest Service crews worked on the firebreak boundary at Road # 450. By 12:00pm on August 16, 2008, the Bridge Creek Fire was approximately five acres. *See* Compl. ¶ 60. Although the Fire had grown, it "had not [yet] significantly spread towards the private property" to the west. Queen Decl. ¶ 12. The firebreak boundary was completed by approximately 2:45pm. *See* Pls.' App. 22. By 4:00pm, a crew member noticed that the Fire had jumped the contingency line. *Id.* at 23; *see also* Compl. ¶ 58. By 5:00pm, the Fire had "returned to its original ... behavior" and was still within the maximum manageable area boundary. *Id.;* Reidy Decl. ¶ 15. Nonetheless, the Bridge Creek Fire had grown to nearly 1,000 acres within the Ochoco National Forest. *See* Reidy Decl. ¶ 15. At 7:00pm, Reidy ordered additional resources for the following day, including helicopters, engines, crews, and bulldozers, with the "goal" of continuing to hold the fire to the east of Road # 450. *Id.* The Haines Index at that time was a 6. *See* Walter Decl. Ex. L, at 10.

By approximately 8:00pm on August 16, 2008, the winds shifted to the west, changing the direction of the Fire. *Id.* at 9; Reidy Decl. ¶ 15; Compl. ¶¶ 63–64. By 11:00pm, the Fire jumped Road # 450; suppression activities began shortly thereafter. *See* Reidy Decl. ¶ 15; Queen Decl. ¶ 13; Compl. ¶ 65. The Bridge Creek Fire actively burned throughout the day on August 17, 2008 and began to subside by August 18, 2008 due to rainfall. *See* Walter Decl. Ex. L, at 11; Compl. ¶ 67. It was completely contained by August 25, 2008. *See* Walter Decl. Ex. L, at 2. The Bridge Creek Fire ultimately burned roughly 2,800 acres of the Ochoco National Forest and 1,960 acres of private land, including property owned by plaintiffs. *Id.;* Compl. ¶¶ 4, 68.

On March 15, 2011, plaintiffs filed a complaint in this Court, alleging that de-

---

**2.** The Haines is a weather index "that measures the potential for rapid forest fire growth within a designated area." Pls.' Resp. to Mot. Dismiss at 4 n. 7 (citation and internal quotations omitted). "A Haines index of 6 means a high potential for large fire growth, 5 means medium potential, 4 low potential, and anything less than 4 means very low potential." *Id.* (citation and internal quotations omitted).

fendant negligently managed the Fire by failing to follow certain WFU procedures and by refusing to implement suppression efforts sooner. *See generally* Compl. On September 13, 2011, defendant filed a motion dismiss based on lack of subject-matter jurisdiction due to the discretionary function exception to the FTCA; the parties completed briefing defendant's motion on December 4, 2012. On February 12, 2013, the Court heard oral argument on that motion. *See generally* Minutes of Proceedings (Feb. 12, 2013) ("Hearing Transcript").

**STANDARD OF REVIEW**

 Where the discretionary function exception to the FTCA applies, "the court lacks subject-matter jurisdiction" and the action must be dismissed. *GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1173 (9th Cir.2002); *see also Cleveland v. United States,* 546 F.Supp.2d 732, 752 (N.D.Cal.2008) ("[a] motion to dismiss on the basis of the discretionary function exception to the FTCA is treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)"). Under Fed.R.Civ.P. 12(b)(1), a party may bring "either a facial or factual" challenge to subject-matter jurisdiction based on the exception. *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000). In either instance, the government "bears the burden of proving the applicability of the discretionary function exception" and the court "accept[s] as true the factual allegations in the complaint." *Terbush v. United States,* 516 F.3d 1125, 1128 (9th Cir.2008); *see also United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). When analyzing a factual attack, the court may consider affidavits or other evidence and resolve disputes where necessary. *See Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004), *cert. denied,* 544 U.S. 1018,

125 S.Ct. 1973, 161 L.Ed.2d 856 (2005) (citation omitted).

When issues relating to jurisdiction and the underlying merits of a claim are intertwined, the court reviews the parties' filings under the summary judgement standard. *Id.* at 1039–40 (citation omitted). Where the summary judgment standard governs, the "plaintiff has the burden of showing there are genuine issues of material fact as to whether the [discretionary function] exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Green v. United States,* 630 F.3d 1245, 1248–49 (9th Cir.2011) (citing *Miller v. United States,* 163 F.3d 591, 594 (9th Cir. 1998)).

**DISCUSSION**

Defendant argues that the discretionary function exception applies in this case, thereby depriving this Court of subject-matter jurisdiction. Plaintiffs contend that dismissal is inappropriate because defendant neither had discretion to manage the Bridge Creek Fire for WFU purposes nor did it follow its own guidelines and policies in so doing. In addition, plaintiffs assert that defendant's decisions, to the extent that they did entail an element of choice, were not susceptible to a policy analysis, such that the exception is inapplicable.

**I. *Applicable Standard of Review***

It is undisputed that this case involves a factual attack on jurisdiction, as opposed to a facial attack. *See generally* Def.'s Mem. in Supp. of Mot. Dismiss; *see also* Pls.' Resp. to Mot. Dismiss 8. Plaintiffs argue that defendant was negligent by failing to follow "mandatory" guidelines at different times from the start of the Fire on August 7, 2008 until suppression com-

menced on August 17, 2008, and that these failures take the case out of the discretionary function exception. However, whether defendant exercised discretion in its management of the Bridge Creek Fire is a separate inquiry from whether those actions were negligent. *See Kennewick Irr. Dist. v. United States,* 880 F.2d 1018, 1029 (9th Cir.1989) ("negligence is simply irrelevant to the discretionary function inquiry ... if the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability"). As such, defendant's jurisdictional attack does not address the underlying elements of plaintiffs' negligence claims. Rather, the factual issues are limited to whether defendant had discretion to manage the Fire, not whether it was negligent in its management of the Fire. Nevertheless, because, in discussing the discretionary function exception, the Court reached the merits of some of plaintiffs' allegations, I will analyze this case in accordance with summary judgment standard.

Accordingly, plaintiffs must show that there is an issue of fact regarding defendant's decisions and conduct relating to the Fire. Defendant has the ultimate burden to demonstrate that, as a matter of law, the discretionary function exception applies to whether and how it managed the Bridge Creek Fire.[3]

## II. *Discretionary Function Exception Test*

■ The "United States can be sued only to the extent that it has waived its sovereign immunity." *Reed ex rel. Allen v. U.S. Dep't of Interior,* 231 F.3d 501, 504 (9th Cir.2000), *cert. denied,* 532 U.S. 1019, 121 S.Ct. 1957, 149 L.Ed.2d 753 (2001) (citation omitted). The FTCA provides such a waiver "for the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employee." 28 U.S.C. § 1346(b); *see also Kelly v. United States,* 241 F.3d 755, 759 (9th Cir.2001). This waiver of immunity is limited; under the discretionary function exception to the FTCA, the government is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a).

■ The Supreme Court created a two-step test to determine the applicability of this exception. *See Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct.

---

3. Ultimately, the standard of review is not critical because the result is the same regardless of whether defendant's motion is construed as one under Fed. R. Cir. P. 12(b)(1) or Fed. R. Cir. P. 56, especially in light of the fact that the resolution of this case did not require the Court to resolve any disputed issues of fact. In fact, with the exception of the declaration of Roy Hogue, a former employee of the BLM knowledgeable in the management of fires in the Ochoco National Forest, plaintiffs have not introduced any relevant evidence that materially contradicts any other evidence of record in this case. *See generally* Pls.' Resp. to Mot. Dismiss; Pls.' App. Defendant objects to this evidence because Hogue "fails to articulate any mandatory duties the Forest Service violated in statutes, regulations, or policies." Def.'s Reply to Mot. Dismiss 35. Plaintiffs did not file a surreply to defendant's objection. *See* LR 56–1(b). Nevertheless, defendant is correct that, beyond concluding that "the Government violated multiple, mandatory duties in its management of the Bridge Creek Fire," Hogue does not specifically identify any compulsory obligations. Pls.' App. 86–90. Further, Hogue's declaration relates to defendant's alleged negligence and, as such, plaintiffs rely on this evidence only to explain technical terms or establish that defendant's conduct "fell far short of acceptable professional standards." Pls.' Resp. to Mot. Dismiss 25, 28, 37; *see also* Pls.' App. 86–90.

1954, 100 L.Ed.2d 531 (1988). Both elements must be met in order for the exception to apply. *See Green,* 630 F.3d at 1251. First, the court considers "whether the challenged actions involve an element of judgment or choice." *Terbush,* 516 F.3d at 1128 (citation and internal quotations omitted). "This inquiry looks at the nature of the conduct, rather than the status of the actor and the discretionary element is not met where a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (citation and internal quotations omitted).

The second prong of the discretionary function test turns on whether the challenged decision is susceptible to a public policy analysis based on "social, economic, or political concerns, such as employee and public safety, the agency's goals and duties, the agency's relationship with the public, etc." *McDougal v. U.S. Forest Serv.,* 195 F.Supp.2d 1229, 1232 (D.Or. 2002) (citation omitted); *see also Terbush,* 516 F.3d at 1128. This element "is designed to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *McDougal,* 195 F.Supp.2d at 1232 (citations and internal quotations omitted). "Even if the decision is an abuse of the discretion granted, the exception will apply." *Terbush,* 516 F.3d at 1128 (citation omitted).

### III. *Governing Statutes, Regulations, Guidelines, and Procedures*

A myriad of legislation, regulation, policies, plans, and implementing documents underlie defendant's initial decision to designate the Bridge Creek Fire as WFU, as well as the subsequent decisions and vari-

ous actions that followed. These materials include:

(1) The Wilderness Act, 16 U.S.C. § 1131 *et seq.* and 36 C.F.R. part 293, which set forth statutory and regulatory direction for management of wilderness areas;

(2) Forest Service Manual 2300, Chapter 2320, entitled "Wilderness Management" (Def.'s Mem. in Supp. of Mot. Dismiss Ex. 1), and Forest Service Manual 5100, entitled "Fire Management" (Snell Decl. Ex. 1; Martin Decl. Ex. B, at 17), which provide direction for defendant's management of WFU fires in designated wilderness areas;

(3) The Wildland Fire Use Implementation Procedures and Reference Guide ("Interagency Guide") (Walter Decl. Ex. H), which articulates procedures for determining if WFU management is appropriate at the outset of a fire and throughout the burn process; it also provides multi-stage assessment tools that are used to evaluate WFU activity; and

(4) The Ochoco National Forest Wildland Forest Use Guide ("Ochoco Guide") (Walter Decl. Ex. A)[4], which is based on, and often expressly adopts, the Interagency Guide.

Discrete provisions are quoted and discussed below as necessary to explain my recommendation.

### IV. *Overview of Forest Service Policies for Wilderness and WFU Management*

"Wilderness" is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain [and

---

4. Plaintiffs rely on exhibits A and H of Walter's declaration; however, they cite to the Interagency Guide and Ochoco Guide as

"Dct. 23–6" and "Dct. 23–4," respectively. *See, e.g.,* Pls.' Resp. to Mot. Dismiss 1–2.

also] an area of undeveloped Federal land retaining its primeval character and influence[,] which is protected and managed so as to preserve its natural conditions." 16 U.S.C. § 1131(c). The Wilderness Act states that an "agency administering any area designated as wilderness . . . . shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character"; accordingly, with limited exceptions, "there shall be no temporary [or permanent] road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area." 16 U.S.C. § 1131(b), (c).

For areas protected under the Wilderness Act, the relevant Forest Service Manual specifies that the number one objective of fire management is to "[p]ermit lightening caused fires to play, as nearly as possible, their natural ecological role." Def.'s Mem. in Supp. of Mot. Dismiss Ex. 1, at 4; see also Martin Decl. Ex. B, at 17 (objective for fire use in wilderness areas is to "reduce future fire suppression costs and unwanted effects [and] restore natural ecological processes"); Snell Decl. Ex. 1, at 9 (same). The Forest Service's response to a naturally ignited fire "is based on ecological, social and legal consequences under which a fire occurs, and the likely consequences on firefighter safety and public safety and welfare, natural and cultural resources, and values." Snell Decl. Ex. 1, at 9. Consistent with the Forest Service Manual, the Ochoco and Interagency Guides (collectively the "Guides") identify the following goals for WFU management: (1) "Provide for firefighter and public safety"; (2) "Develop a cost effective program for using [natural ignitions] to achieve resource objectives"; (3) "Reduce, to an acceptable level, the risks and consequences

of wildfire within or escaping from the Ochoco National Forest"; and (4) "Provide direction regarding appropriate management response, including constraints, techniques, methods, tools, and equipment." Walter Decl. Ex. A, at 10; see also Walter Decl. Ex. H, at 4.

## V. *Discretionary Function Exception Prong One: Discretion*

Under the first prong of the two-part *Berkovitz* test, this Court must determine whether there was a regulation or policy in place that specifically prescribed a particular course of action regarding defendant's WFU management of the Bridge Creek Fire. Defendant argues that there was "no statute, regulation, policy, or procedure, specifying that the Forest Service must initially suppress the Bridge Creek Fire, or specifying that the Forest Service change its management of the fire earlier than was actually decided." Def.'s Mem. in Supp. of Mot. Dismiss 14; see also Def.'s Reply to Mot. Dismiss 5 ("the procedural guidelines did not eliminate the discretion of the Forest Service to manage Bridge Creek fire as a WFU and did not mandate the fire be suppressed"). As a result, defendant contends that the first element of the discretionary function exception is fulfilled.

Conversely, plaintiffs contends that the Guides impose numerous "mandatory obligations" on defendant and, thus, the challenged conduct, including whether to manage or suppress the Fire, was not discretionary. See Pls.' Resp. to Mot. Dismiss 10–33. Specifically, plaintiffs assert that the following actions violated a prescribed course of conduct: (1) failing to consider required information and properly complete the Strategic Size–Up form in deciding whether to initially manage the

Bridge Creek Fire for WFU [5]; (2) having the Periodic Assessment Signature Tables signed by unauthorized individuals on August 8, August 12, August 15, and August 16; (3) deploying an unqualified Fire Use Management Team ("FUMT"); (4) refusing to abandon WFU management and suppress the Fire after the Haines Index reached 5 on August 14; and (5) initiating alleged suppression tactics on August 15 and August 16 while still managing the Fire for WFU. *See generally id.*

■ Plaintiffs' arguments are unpersuasive. The Guide provisions that plaintiffs rely on in support of their claims do not mandate a particular course of action. Rather, these documents provide objectives, policies, and guidelines for managing WFU fires. *See, e.g.,* Walter Decl. Ex. A, at 5 ("[t]he purpose of [the Ochoco Guide] is to describe the process under which fires may be designated and managed as [WFU] fires within the Ochoco National Forest [and] to assist decision makers from the initial Go/No Go decision through a broad spectrum of complexities related to managing a [WFU] event"); *see also* Walter Decl. Ex. H, at 4 ("[the Interagency Guide] provides direction, guidance, and assistance [for WFU]"). Notably, at no point do the Guides or Forest Service Manuals state that the failure to follow any one of the allegedly mandatory

provisions requires WFU management to be abandoned and suppression to begin. Critically, the Interagency Guide expressly specifies, in regard to certain provisions that are not at issue here, when the failure to fulfill mandatory language requires in a shift in management objectives. *See, e.g.,* Walter Decl. Ex. H, at 24, 34–35, 40.[6] Where, as here, the "broader goals sought to be achieved necessarily involve an element of discretion," the inclusion of "some mandatory language" in fire management procedures "does not eliminate discretion." *Miller,* 163 F.3d at 595; *McDougal,* 195 F.Supp.2d at 1232.

The Ninth Circuit found very similar guidelines and policies discretionary in the context of fire suppression. In *Miller,* a lightning storm in the Ochoco National Forest lit several fires spread over a wide area. *See Miller,* 163 F.3d at 593, 595. The Forest Service was unable to send aerial fire retardants, smokejumpers, or fire engines to fight one of the fires—the Bald—Butte fire—because those resources were already committed to other areas. *Id.* at 592. The Fire Management Officer concluded that a direct ground-based attack on the Bald—Butte fire would be ineffective and instead directed Forest Service officials to find and suppress other small fires. *Id.* The Bald—Butte fire eventually joined with two other fires and

---

**5.** For the first time at oral argument, plaintiffs also alleged that the initial decision to manage the Bridge Creek Fire for WFU purposes was negligent because "[n]obody knew what caused this fire [since] no one went out and investigated it [or] where the boundary was." Hearing Transcript at 33. Aside from the fact that the manner in which this argument was raised failed to give defendant the requisite notice, plaintiffs' assertion is undermined by their own pleadings. *See, e.g.,* Compl. ¶¶ 8–10 ("storms ignited 25 fires on the Ochoco National Forest ... one of which became the Bridge Creek Fire"); Pls.' Resp. to Mot. Dismiss 1–2 ("lightening strikes ignited fires on the Ochoco National Forest ...

including the Bridge Creek Fire"); *see also Dovenberg v. United States,* 2009 WL 3756370, *3 (D.Or. Nov. 5, 2009), *aff'd,* 407 Fed.Appx. 149 (9th Cir.2010) (refusing to consider allegations first raised in the plaintiff's response brief). As such, the Court will only address this allegation to the extent it relates to plaintiffs' Strategic Size–Up argument.

**6.** For instance, the Interagency Guide states that "[i]f the Decision Criteria Checklist is no longer valid, management of the fire for resource benefits can no longer continue." Walter Decl. Ex. H, at 24.

destroyed the plaintiffs' property. *Id.* at 593.

In arguing that the discretionary function exception did not apply, the plaintiffs in *Miller* relied on several "sources of mandatory language." *Id.* at 594. One such source, the Forest Service Mobilization Guide, provided that

> an employee must (1) report a discovered wildfire and take appropriate action until relieved; (2) not pass up an unmanned fire, even if the employee is not rated as meeting primary firefighter fitness standards; if the employee is the first qualified firefighter to arrive at the fire, (3) assume Incident Commander status until formally relieved; (4) not hesitate to use cooperator crews within the operation area; and if dispatcher, (5) assure sufficient initial attack forces are available within established time standards.

*Id.* Despite the fact that the Forest Service Mobilization Guide, as well as the other sources at issue, contained administrative requirements and some mandatory language, the Ninth Circuit held that they provided mere guidance rather than compulsory and specific standards. *Id.* at 595. Thus, even where federal and state laws outline certain requirements "for fire suppression, they do not eliminate discretion because they do not tell firefighters how to fight the fire [and they do] not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time." *Id.; see also McDougal,* 195 F.Supp.2d at 1234–38 (where the plaintiff challenged analogous provisions in Forest Service Manual Chapters 5100 and 2300, as well as the Malheur National Forest Fire Management Action Plan, the court, relying on *Miller,* held that the government's discretion was not eliminated, de-

spite the existence of some mandatory language).

Like *Miller* and *McDougal,* the policies and guidelines in this case make clear that the primary objective for wilderness fire management is permitting lightening-caused fires to play their natural ecological role. While the Forest Service Manual and Guides outline various procedures and considerations for designating a fire for WFU purposes and managing it as such thereafter, those provisions do not eliminate discretion because they do not dictate the precise manner in which defendant manages a WFU fire. Rather, the Forest Service Manuals and Guides expressly contemplate that fires are unique and mutable, such that their management inherently depends on a number of variables, including the experienced judgment of Forest Service personnel. *See, e.g.,* Walter Decl. Ex. A, at 5, 32–33; *see also Thune v. United States,* 872 F.Supp. 921, 924 (D.Wyo.1995) (where the plaintiff alleged that the Forest Service was negligent in setting and controlling a fire, the court held that the discretionary function exception applied, noting that "the ultimate decision of whether the [prescribed] burn should proceed was based on ... judgment").

Although the present dispute involves wilderness fire management, as opposed to fire suppression, I find that the rationales set forth in *Miller* and *McDougal* are applicable here, especially in light of the similarities between the relevant policies and guidelines in this case and those at issue in *Miller* and *McDougal.* *Compare Miller,* 163 F.3d at 594–95, *and McDougal,* 195 F.Supp.2d at 1235–38, *with* Pls.' Resp. to Mot. Dismiss 10–33. As such, defendant's challenged actions necessarily involved an element of choice.[7] *See Green,*

---

7. Plaintiffs, at times, seemingly concede that

managing the Fire for WFU purposes re-

630 F.3d at 1250 ("where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task," an "agency must exercise judgment"). Additionally, the Court notes that many of the actions that plaintiffs challenge relate to administrative requirements. Such actions do not undermine management decisions based on underlying WFU consideration. Further, to the extent that plaintiffs allege that defendant's actions are negligent, such allegations are irrelevant. In other words, the challenged actions do not drive defendant's WFU management strategy. As discussed more fully below, I decline to depart from established precedent that shields the government from liability in the majority of cases involving wilderness fires. Therefore, defendant has satisfied the first prong of the two-part discretionary function analysis. Nonetheless, in order to provide the most complete review of this case, and for the purposes of preserving the record, the Court will briefly address each of plaintiffs' arguments.

### A. *Initial WFU Decision*

Plaintiffs contend that defendant was not authorized to manage the Fire for WFU purposes because a Strategic Size–Up was never completed. *See* Pls.' Resp. to Mot. Dismiss 11–15. Moreover, plaintiffs assert that defendant "flaunted" its duties in categorizing the Bridge Creek Fire for WFU and engaged in a "charade" when Walter completed a WFU management delegation form on August 7, 2008. *Id.* at 13. In support of their assertions, plaintiffs rely on the following language from the Interagency Guide:

A Strategic Fire Size–Up is completed for all wildland fires and provides infor-

mation necessary to decide whether to implement a wildland fire use or a suppression response ... For each wildland fire use action, the agency administrator (or delegated individual) is required to initially affirm and periodically reaffirm the capability to manage the fire as a WFU event. This process is intended to document and ensure management accountability throughout the wildland fire use.

Walter Decl. Ex. H, at 10, 23; *see also* Walter Decl. Ex. A, at 37.

The Guides grant the Forest Service discretion to manage a fire for WFU purposes if the Strategic Size–Up indicates that it was "naturally caused and in [an approved] fire management unit," such as an area protected under the Wilderness Act. *See* Walter Decl. Ex. H, at 10; *see also* Walter Decl. Ex. A, at 32, 35. A "suppression action is initiated" only where a fire does "not mee[t] these criteria." *See* Walter Decl. Ex. H, at 10. Thus, the purpose of the Strategic Size–Up is to gather information in order to determine whether WFU management is appropriate based on the two above-listed qualities. *See* Walter Decl. Ex. H, at 10, 15, 23. That is precisely what occurred in this case.

As plaintiffs' own complaint alleges, the Bridge Creek Fire was lightning-caused and was within a qualifying wilderness area. *See* Compl. ¶¶ 2, 8–10. Consistent with plaintiffs' allegations, the Strategic Size–Up established that the Bridge Creek Fire was eligible for WFU management because it was naturally caused by lightening and within the Bridge Creek Wilderness. *See* Walter Decl. Ex. B, at 3. This form is identical to the Ochoco Guide

quired considerable discretion. *See, e.g.,* Hearing Transcript at 69, 116; *see also* Pls.' Resp. to Mot. Dismiss 37 ("plaintiffs do not

contend that the FS could not have properly decided to manage the fire as a WFU fire").

template in all respects, except that it does not include a line for initials and date/time; plaintiffs, however, do not direct the Court to any mandate that the failure to initial or date the Strategic Size–Up requires a determination that suppression must occur. *Compare* Walter Decl. Ex. B, at 3, *with* Walter Decl. Ex. A, at 72; *see also* Walter Decl. Ex. H, at 13. More importantly, the form is otherwise complete and contains all the pertinent information, including a description of the Fire's observed behavior, location, cause, and that the Fire is WFU approved. *See* Walter Decl. Ex. B, at 3. Therefore, the evidence of record demonstrates that the Bridge Creek Fire qualified for WFU management.

Even if, as plaintiffs contend, the precise coordinates of the Fire were inaccurate on this form, such an error does not suffice as evidence that defendant failed to abide by any mandatory policy guidelines. The Strategic Size–Up was based on a visual observation from a lookout tower in a remote wilderness area. *Id.* Because a wilderness area is, by definition, one that is left in its natural state and therefore does not contain roads, defendant had limited access to the source of the Fire. Defendant's method for identifying the fire location and source—i.e. from an elevated viewpoint by a spotter—was therefore reasonable under the circumstances. Further, the fact that defendant did not gather more refined and precise information regarding location and source until August 10, 2008, when the Fire was still .25 acres in size, does not affect defendant's discretion in identifying and managing the Fire for WFU. *See* Walter Decl. Ex. B, at 19–22. This is especially true because defendant's on-the-ground activities confirmed that the Fire qualified for WFU management. *Id.; see also* Walter Decl. Ex. H, at 13 ("[i]f the fire is located in an [area] approved for wildland fire use and naturally ignited, it becomes a WFU candidate and planning continues"). Plaintiffs neglect to identify any source that establishes that the Strategic Size–Up was required to include precise location information based on an on-the-ground eyewitness account. *See* Pls.' Resp. to Mot. Dismiss 11–15; *see also* Hearing Transcript at 118–23.[8] Plaintiffs also fail to cite to any mandate that the coordinates in an initial Strategic Size–Up be absolutely precise. *See* Pls.' Resp. to Mot. Dismiss 11–15.

Finally, plaintiffs argument that defendant "flaunted" its duties and engaged in a "charade" due to the August 7 delegation is rejected. *Id.* at 13. The delegation at issue, to Fire Staff Officer Craig Letz, was not effective until 6pm on August 8, 2008. *See* Letz Decl. ¶¶ 1–2, 11 & Ex. A. Plaintiffs fail to cite to any source that precludes defendant from preparing management delegations prior to completion of a WFIP or that take effect once a future WFIP decision is made. *See* Walter Dec. Ex. H, at 42 ("[n]o interagency standards exist for the configuration of teams responsible for preparation of [WFIPs], the duration of time they must be in place, and what products they must create").

Regardless, the foregoing reveals that defendant's decision to manage the Bridge Creek Fire for WFU was not a charade. The evidence of record establishes, and indeed plaintiffs admit, that the Fire was

---

**8.** While plaintiffs did not cite to any such mandate, they did identify a provision within the Ochoco Guide that states "[f]ire cause will be determined by the first unit on-scene." Walter Decl. Ex. A, at 32. This language, however, does not define the term "on-scene" and, further, does not prescribe a specific time period in which "on-scene" activities must be commenced. Therefore, this provision does not eliminate defendant's discretion.

within the Bridge Creek wilderness area of the Ochoco National Forest and ignited by lightening. *See* Compl. ¶¶ 8–10. The record also reveals that multiple fire experts carefully considered the relevant factors, as articulated in the Guides, prior to Walter's authorization of WFU management on August 8, 2008. *See generally* Letz Decl.; Queen Decl.; Walter Decl. As such, defendant had discretion to manage the Bridge Creek Fire for WFU purposes.

## B. *Periodic Fire Assessment Signature Tables for August 8, 12, and 15*

Plaintiffs next assert that defendant failed to follow mandatory procedures in reaffirming the Bridge Creek Fire for WFU management on August 8, August 12, and August 15 because the Periodic Fire Assessment Signature Tables were not signed by the proper party. *See* Pls.' Resp. to Mot. Dismiss 15–18. Pursuant to the Guides, the Decision Criteria Checklist is the critical document in establishing Stage I WFIP management. *See* Walter Decl. Ex. A, at 31–33; Walter Decl. Ex. H, at 12, 24. As discussed above, for each WFU action, "the agency administrator (or delegated individual) is required to initially affirm and periodically reaffirm the capability to manage the fire as a WFU event" by signing the Periodic Fire Assessment Signature Table. Walter Decl. Ex. A, at 37; Walter Decl. Ex. H, at 10, 23. Signature authority "can be redelegated to specific positions [but] agency administrators must document, in writing, the revalidation authority to designated individuals." Walter Decl. Ex. H, at 28.

In this case, it is undisputed that Walter was the Forest Supervisor/Agency Administrator from August 7 through August 15. Walter left the area on the afternoon of August 15 on personal business and formally delegated this role in writing to Queen, "who remained the Agency Administrator in [Walter's] absence, until the fire exceeded the maximum manageable area and suppression began." Walter Decl. ¶¶ 5, 15–16 & Ex. I; Queen Decl. ¶ 9. On August 8, 2008, Walter "approved WFU for the Bridge Creek Fire by completing a stage 1 [WFIP]," including the Decision Criteria Checklist. Walter Dec. ¶ 7 & Ex. B. In addition, Walter testified that, from "August 8, 2008 through August 15, 2008, I assessed the risks of the Bridge Creek Fire each day," "answered the five questions in the WFIP 'Decision Criteria Checklist," and "sign[ed] and dat[ed] the 'Periodic Fire Assessment Signature Table.'" *Id.* at ¶ 14. While Walter "cannot locate [his] signature table," he explicitly "recall[ed] completing this task daily" during that time frame. *Id.* Plaintiffs acknowledge this testimony. *See* Pls.' Resp. to Mot. Dismiss 16 n. 18. Further, plaintiffs do not challenge the veracity of Walter's sworn statements and chose not to depose him during the jurisdictional discovery period afforded by this Court. *Id.*; *see also* Def.'s Reply to Mot. Dismiss 11; Hearing Transcript at 31. As such, because it is uncontradicted,[9] the Court accepts as true Walter's testimony that he signed the Periodic Assessment Signature Tables daily from August 8 through August 15 and believed WFU management was appropriate on each day.

---

**9.** Plaintiffs asserted at oral argument that "there's a genuine issue of material fact on that point, given that we do have signatures from other individuals who were not the agency administrator." Hearing Transcript at 45. The Court finds that other staff members' preparation of and signature on the Periodic Fire Assessment Signature Tables does not create a genuine issue of material fact as to this issue because, as discussed below, the Guides authorizes these actions.

Even ignoring Walter's testimony, however, the Guides expressly contemplate that "[l]ocal fire staff review and complete the assessments and checklist." Walter Decl. Ex. A, at 41; Walter Decl. Ex. H, at 28. It is undisputed that, on August 8 and August 12, two local fire staff, Fire Management Officer Kevin Donham and Fire Planner David Owen, reviewed and completed the Periodic Fire Assessments. *See* Walter Decl. Ex. E, at 9–10 & Ex. G, at 12. It is further undisputed that Queen reviewed and completed the Periodic Fire Assessment on August 15. *See* Queen Decl. ¶ 10 & Ex. A. While the WFIP, including the Periodic Fire Assessment Signature Table, is then to be "reviewed and confirmed on the specific assessment frequency" by the "agency administrator (or his/her designee)," there is nothing in the Guides dictating that WFU management must be abandoned if these requirements are unfulfilled. Walter Decl. Ex. A, at 41; Walter Decl Ex. H, at 28.

Rather, as discussed above, the purpose of the Periodic Fire Assessment Signature Table is "to document and ensure management accountability throughout the wildland fire use" by, in pertinent part, "affirm[ing] continued management of the fire to meet resource objectives" and "confirm[ing] and document[ing] the decision to establish, remain at, or move up to the next stage of planning." Walter Decl. Ex. H, at 23; *see also* Walter Decl. Ex. A, at 37, 41–42. Here, Walter's testimony establishes that, regardless of whether he actually signed the Periodic Fire Assessments at issue, he and his staff were performing the requisite duties associated with WFU management. *See* Walter Decl. ¶¶ 6–14. Accordingly, defendant did not violate any mandates pertaining to the August 8, 12, or 15 Periodic Fire Assessment Signature Tables that would affect the discretionary function exclusion.

## C. *Periodic Fire Assessment Signature Tables for August 15 and 16*

Plaintiffs also raise several technical arguments regarding Walter's delegation of the Forest Administrator role to Queen. Specifically, plaintiffs assert that Queen lacked authority to perform the August 15 and August 16 Periodic Fire Assessments, thereby stripping defendant of discretion to manage the Fire for WFU. Plaintiff argues the delegation from Walter was not yet effective or, alternatively, Queen's authority to do so lapsed due to escalating Fire conditions. *See* Pls.' Resp. to Mot. Dismiss 18–26. As defendant notes, however, "there is a world of difference between paperwork formalities and what really drives WFU management." Def.'s Reply to Mot. Dismiss 12. More importantly, plaintiffs once again fail to identify, and the Court is not aware of, any requirement that a technically incorrect signature invalidates a fire management strategy or requires an immediate and dramatic shift to a fire suppression objective. The Court will nonetheless address each of plaintiffs' arguments.

### i. *Walter's Delegation of Authority to Queen*

Plaintiffs argue that Queen's August 15 signature on the Periodic Assessment Signature Table was invalid because he had not yet been formally delegated authority to manage the Bridge Creek Fire. *See* Pls.' Resp. to Mot. Dismiss 18–19. It is undisputed that Walter left the area on August 15, 2008 and that, beginning on August 16, 2008, Queen had formal delegation to oversee the Fire. *See* Walter Dec. ¶ 16 & Ex. I. As discussed above, Walter provided uncontradicted testimony that he signed the Periodic Assessment Signature Table on August 15, 2008. *See* Walter Decl. ¶ 14. In other words, because plaintiffs do not dispute Walter's assertions that he indeed

performed a Periodic Fire Assessment each day between August 8th and 15th, there is no basis for this Court to find that defendant deviated from the Guides' procedures in this regard.

In addition, at that time, District Ranger Queen had been formally designated as Walter's on-scene representative for the Bridge Creek Fire. *See* Martin Decl. Ex. A, at 2–6. As representative, Queen was the "on-scene agency administrator." *See* Martin Decl. Ex. B, at 25; *see also* Martin Decl. Ex. A, at 2–6. Further, prior to signing the Periodic Assessment Signature Table on August 15, Queen spoke directly with and was "working for" Walter regarding the Bridge Creek Fire. Queen Decl. ¶ 11; Martin Decl. Ex. A, at 2–6, 9–12; *see also* Martin Decl. Ex. B, at 6 (communications Walter and Queen from August 8 through August 16 were "continuous and were virtually all in person communications or telephonic communications"). Accordingly, Queen was authorized at that time to make final decisions about the Fire with Walter's concurrence and to sign the August 15 Periodic Fire Assessment Signature Table. *See* Martin Decl. Ex. A, at 4–6; *see also* Walter Decl. Ex. A, at 31 ("Forest Supervisor" or "District Ranger" with delegated authority may complete Periodic Fire Assessments).

### ii. *Escalating Fire Conditions on August 15 and August 16*

In the alternative, plaintiffs argue that, because "fire conditions or complexity continued to escalate during the afternoon of August 15, 2008 and into August 16, 2008," signature authority reverted back to Walter, such that Queen had no authority to sign the Periodic Assessment Signature Table on those dates and to continue managing the Bridge Creek Fire for WFU purposes. Pls.' Resp. to Mot. Dismiss 23–24 (citing Pls.' App. 66–67 (Queen's testimony that, on the evening of August 15, 2008, he did not disagree with Reidy's assessment that Fire conditions, complexity, or both had escalated)). Plaintiffs' argument derives from a single sentence in the Ochoco Guide, which states that "[i]f or when fire conditions or complexity levels escalate, Periodic Fire Assessment signature authority will automatically and immediately revert to the agency administrator who made the initial delegation of authority." Walter Decl. Ex. A, at 42.

Notably, and dispositive as to plaintiffs' claim, the foregoing sentence does not indicate that reversion of signature authority requires absolute compliance or else WFU management must cease and suppression commence. *Id.* This sentence also does not include any standard for how to determine whether fire conditions or complexity have escalated to the point of requiring a reversion of signature authority. "[A]n agency retains discretion whether to act where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task." *Bailey v. United States,* 623 F.3d 855, 860 (9th Cir.2010), *cert. denied,* —— U.S. ——, 132 S.Ct. 814, 181 L.Ed.2d 525 (2011).

Plaintiffs' interpretation also conflicts with other WFU procedures that expressly allow delegations of authority after a WFU fire progresses to the point of requiring a Stage III WFIP analysis, which necessarily entails escalating fire conditions. *See* Walter Decl. Ex. H, at 41; *see also* Walter Dec. Ex. A, at 32 (if WFU "is the selected strategy, the forest supervisor or district ranger will follow the WFIP process"). More importantly, as discussed above, regardless of who had technical authority to sign the Periodic Fire Assessment Table or whether signature authority reverted back due to escalating conditions, Walter remained directly involved in the August 15 and August 16 discussions regarding

Bridge Creek Fire management and agreed that continued WFU management was appropriate. *See* Martin Decl. Ex. A, at 2–6, 9–15; *see also* Martin Decl. Ex. B, at 6.

Plaintiffs' argument that signature authority had somehow reverted back to Walter, based on the factors set forth in a blank "complexity analysis" form, is unavailing for three reasons. *See* Pls.' Resp. to Mot. Dismiss 21; Pls.' App. 12–16. First, this form, which appears in "Fireline Handbook PMS 410–1," serves to assist an agency in determining whether additional incident management support is needed; there is no evidence in the record indicating that defendant was constrained to follow the "Fireline Handbook PMS 410–1" and, further, this form does not relate to whether authority reversion is triggered by escalating fire conditions. *See* Pls.' App. 12–16. Second, plaintiffs assert that the Haines Index levels and a breach of a contingency firebreak proved that the Bridge Creek Fire's complexity had increased such that signature authority "automatically" reverted to Walter. *See* Pls.' Resp. to Mot. Dismiss 21–23. Yet neither the Haines Index nor contingency firebreaks are listed as factors on the form cited by plaintiffs. *See id.* at 21 (listing factors). Third, this "complexity analysis" form does not set any mandatory management parameters or establish that suppression must occur. Even where analysis of these factors results in the highest possible complexity, the strongest language on this form merely suggests that the agency "consider requesting the next level of incident management support." Pls.' App. 12–16.

Further, the Court notes that plaintiffs' attempt to categorize the Fire as one that was slowly and linearly escalating over a period of several days is contradicted by the record. The facts clearly establish that the Bridge Creek Fire blew up quickly and unexpectedly. On August 14, 2008, the Fire was only .25 acres in size; plaintiffs' complaint acknowledges this fact. *See* Compl. ¶ 49. The Bridge Creek Fire showed low intensity and "little activity" on August 14 and August 15. *See* Martin Decl. Ex. B, at 30–31; *see also id.* at 20 ("[f]ire behavior was minimal" during the afternoon of August 15); Walter Decl. Ex. K, at 31 (same). By early afternoon on August 16, 2008, the Fire was approximately five acres in size. *See* Martin Decl. Ex. B, at 31;Walter Decl. Ex. K, at 32, 35. At late afternoon on August 16, "everyone agreed that the fire was still within the MMA [maximum manageable area] perimeter and meeting objectives." Walter Decl. Ex. K, at 35. The Bridge Creek Fire was also still "moving predictably" at that time. Martin Decl. Ex. B, at 28. Even as its behavior increased later on August 16, the Bridge Creek Fire was burning uphill and, as such, was moving away from plaintiffs' private lands. *See id.* at 34. It was not until late evening on August 16 that the Bridge Creek Fire dramatically changed directions and swept towards plaintiffs' properties, thereby causing the subject damage alleged in this lawsuit. *Id.;* Compl. ¶¶ 63–64; Walter Decl. Ex. K, at 36–37; *see also* Queen Decl. ¶ 13 ("[t]he downhill spread of the fire was a rare event and not predictable").

**D.** *Fire Use Management Team Requirements*

Plaintiffs contend that, because defendant ordered an outside FUMT to oversee fire management and because that team arrived with the positions of Operations Section Chief initially filled by a trainee, defendant fails the first part of the discretionary function test. *See* Pls.' Resp. to Mot. Dismiss 26–28. Plaintiffs acknowledge that "Jeffrey Riepe, a qualified Operations Section Chief, joine[ed] the Team

[on] the afternoon of Saturday the 16th," but argue that, due to his late arrival, Riepe was unable "to make any meaningful difference in management of the fire before it crossed on to plaintiffs' property." *Id.* at 28. Plaintiffs rely on the Interagency Guide to support their argument, which states that

> as conditions escalate . . . additional personnel can be added [and] if conditions extend to the highest difficulty levels, a formal management team can be ordered . . . These teams may be developed locally from unit and cooperation personnel or be a formal, established fire use management team (FUMT) obtained through the established resource ordering process. A FUMT has a minimum standard of Type II qualified personnel, with the Incident Commander having attended S-580 Advanced Fire Use Applications.

Walter Decl. Ex. H, at 42.

As an initial matter, outside of the Incident Commander, this provision does not identify any particular qualifications for a FUMT's members. Plaintiffs do not argue that the Incident Commander failed to meet this minimum standard. *See* Pls.' Resp. to Mot. Dismiss 27–28. Further, the Interagency Guide does not, in fact, set minimum qualification requirements for FUMTs, but simply notes that a FUMT "has a minimum standard of Type II qualified personnel." Walter Decl. Ex. H, at 42. This general description does not obligate defendant to ensure that outside FUMTs arrive staffed in a particular manner. In addition, while not dispositive, because defendant was unable to commence suppression efforts due to unsafe conditions during the afternoon of August 16 and because Riepe arrived approximately eight hours prior to the change in wind that precipitated the damage to plaintiff's property, it is not apparent that

having a more "qualified" Operations Section Chief on-site earlier would have made any difference. *See* Martin Decl. Ex. A, at 17; *see also* Walter Decl. Ex. K, at 36 (indicating that the winds shifted towards plaintiffs' property at approximately 8pm on August 16); Hearing Transcript at 54 (Riepe "signed in at noon to the headquarters in the forest" on August 16); Pls.' App. 83–84 (Queen testifying that limited resources prevented defendant from ensuring "that a team that was coming in was operationally ready[, which] potentially would have been better able to, for instance, mobilize resources to prepare the 450 Road").

Finally, plaintiffs cite no authority for the conclusion that, if there was a trainee improperly on the FUMT, suppression of the Bridge Creek Fire was required. Rather, the Ochoco Guide indicates that Forest Service personnel "are expected to exercise their judgement" in determining the proper composure of the WFU management team. Walter Decl. Ex. A, at 39–40; *see also* Hearing Transcript at 52 (the FUMT is "on the ground" fighting the Fire, under the direction and oversight of the Agency Administrator). Accordingly, because this provision does not set forth any mandatory and specific requirements for FUMT staff, other than for the Incident Commander, defendant retained discretion to manage the Bridge Creek Fire for WFU purposes.

### E. *Significance of the August 14, 2008 Haines Index*

Plaintiffs assert that defendant was required to suppress the Bridge Creek Fire after the afternoon of August 14, 2008 because, at that time, "it could no longer be said that both the current and forecast Haines index for the area of the Bridge Creek fire were 5 or less." Pls.' Resp. to Mot. Dismiss 29. As the basis for their

argument, plaintiffs rely on the factors applicable to the determination of whether a fire qualifies for WFU management. *Id.* at 28–29 (citing Walter Decl. Ex. A, at 32).

Plaintiffs' argument is unpersuasive. The Ochoco Guide makes clear that these factors apply only to the initial consideration of whether WFU management is possible for a new fire: "the following [factors] will be considered as to whether conditions are acceptable for [WFU] ... If all of the above criteria are met, natural ignitions may be considered for Fire Use." Walter Decl. Ex. A, at 32. Thus, to the extent that this language sets forth any requirements, they are only in regard to identifying the proper objective where a fire is ignited naturally within a qualifying area. Here, however, it is undisputed that at the time the Bridge Creek Fire began, the current and projected Haines Index was less than 5; as such, plaintiffs do not argue that any of these factors barred WFU management on August 8, 3008, when defendant completed the Stage I WFIP. *See* Pls.' Resp. to Mot. Dismiss 28–30; *see also* Martin Dec. Ex. B, at 18–19.

Moreover, plaintiffs' argument ignores the series of provisions that guide defendant once WFU management is actually commenced. After a fire is selected for WFU, defendant considers variables and concerns that are distinct from the initial eligibility factors. Notably, the Haines Index is not an essential part of this analysis. *See* Walter Decl. Ex. A, at 35; Walter Decl. Ex. H, at 35–36; *see also* Queen Decl. ¶ 8. The Guides establish that a high risk fire situation still allows for WFU management where the Agency Administrator adjudges that to be the proper response. *See* Walter Decl. Ex. A at 33;

Walter Decl. Ex. H, at 33–36 ("[n]o mandatory requirements exist for risk assessment"). In sum, plaintiffs have not cited to, and the Court is not aware of, any provision within the Guides or otherwise that requires suppression efforts once the Haines Index reaches a certain level after a fire has already been approved for WFU management.

Nevertheless, the record before the Court reveals that defendant did consider the available Haines Index information. In the August 14, 2008 WFIP, defendant noted a "high risk rating" because the Fire was occurring in mid-season, with dry conditions and in proximity to the Forest Service boundary. *See* Walter Decl. Ex. G, at 6. In exercising his discretion, however, Walter determined that risk was not unacceptable; this decision was based on a variety of concerns and factors, including the Haines Index. *Id.* at 2–3; *see also* Martin Decl. Ex. A, at 13; Martin Decl. Ex. B, at 3. Therefore, because the Guides grant defendant discretion in determining how the Haines Index affects subsequent fire-related decisions, the increase in the August 14 Haines Index did not compel an immediate shift in management objectives.

### F. *Fire–Control Tactics on August 15 and August 16*

Finally, plaintiffs argue that, by constructing a firebreak on August 15, 2008, defendant shifted the management objective of the Bridge Creek Fire from resource benefit to suppression and, by continuing WFU management thereafter, acted contrary to mandate. *See* Pls.' Resp. to Mot. Dismiss 30–33. In support of their assertion, plaintiffs cite to the Interagency Guide [10], which states that

---

**10.** Plaintiffs also rely on the "Minimum Impact Suppression Tactics" guidelines and the "Glossary of Wildland Fire Terminology," prepared by the National Wildlife Coordinat-

ing Group. *See* Pls.' Resp. to Mot. Dismiss 31. These sources, however, do not set forth any mandatory and specific requirements that are applicable to the case at bar. *See* Pls.'

[o]nly one management objective will be applied to a wildland fire. Wildland fires will either be managed for resource benefits or suppressed. A wildland fire cannot be managed for both objectives concurrently ... Once a wildland fire has been managed for suppression objectives, it may never be managed for resource benefit objectives.

Walter Decl. Ex. H, at 7.

Plaintiffs' argument fails to acknowledge that the Interagency Guide expressly allow on-the-the ground fire "mitigation actions" during Stage III of the WFIP to "serve the defensibility of a particular point, area, or line," including a "planning area boundary"; "check, direct, or delay the spread of fire"; or "minimize threats to life, property, and resources." *Id.* at 40; *see also id.* at 39 ("[b]ased on the risk assessment, decision makers decide what to do about managing risk"). In addition, the Interagency Guide specifically allows for "contingency actions" to be employed during a WFU fire to "control the spread of fire into unwanted areas or to prevent it from adversely impacting a sensitive value." *Id.* at 40.

Even if a WFU fire crosses the maximum manageable area boundary, defendant may utilize "onsite firefighting resources ... to achieve control" and continue WFU management. *Id.; see also id.* at 34 (fire that exceeds the maximum manageable area "does not require an automatic change to a different strategy"). Rather, if the fire is reconfined within 48 hours to the maximum manageable area, with "whatever resources are available to deal with the situation," defendant may continue with WFU management. *Id.* at 34–35. This language makes clear that using an individual tactic that could be labeled as "suppression" does not change the overall WFU objective; the fact that Queen referred to these actions as "suppression" efforts is not relevant to that objective. *See* Pls.' App. 53–56. In sum, the Interagency Guide establishes that suppression is appropriate only after a WFU "is no longer achieving the intended resource management objectives and contingency or mitigation actions have failed." Walter Decl. Ex. H, at 7.

Here, defendant's challenged conduct was explicitly permitted by and performed in accordance with the above-listed requirements. On August 14, 2008, defendant commenced a Stage III WFIP.[11] *See* Walter Decl. ¶ 13 & Ex. G; *see also* Hearing Transcript at 101 ("Forest Service was in the midst of completing the Stage 3 plan" on August 14). The August 15 contingency firebreak was part of WFU management because this tactic was used to guard against the spread of the fire. *See* Reidy Decl. ¶ 11 (firebreak was "intended to block the spread of the fire to the private lands to the west"); Queen Decl. ¶ 11 (same). Similarly, the use of backfires on the Road # 450 were employed as a firebreak to protect nearby private property, as that road marked the boundary of the Fire's maximum manageable area. *See* Reidy Decl. ¶ 11; Queen Decl. ¶ 12. Within two hours of jumping the firebreak on August 16, the Bridge Creek Fire "re-

App. 27 (indicating that Minimum Impact Suppression Tactics were employed only to the extent they are consistent with overall WFU management).

11. The Interagency Guide stipulates that the Agency Administrator, or delegated individual, must perform the Stage III WFIP within

"7 days after [the] need [is first] indicated." Walter Decl. Ex. H., at 11. Thus, defendant had until August 21, 2008 to perfect this analysis. However, because the management objective shifted to suppression on late August 16 or early August 17, a Stage III WFIP was never completed.

turned to its original ... behavior" and was still within the maximum manageable area boundary. *See* Pls.' App. 23; *see also* Compl. ¶ 58; Reidy Decl. ¶ 15. Further, the use of chainsaws, helicopter landings, and other tactics were part of a strategy to serve the underlying WFU objectives. *See* Pls.' App. 27. Because these activities were mitigation and contingency measures performed pursuant to WFU management and authorized by the Interagency Guide, they did not mark a shift to a suppression objective or indicate that defendant was managing the Fire for dual purposes. In other words, because the Interagency Guide affords defendant broad discretion to undertake such mitigation or contingency tactics while still pursuing WFU management, at no point was the Bridge Creek Fire managed for two primary objectives.

Therefore, defendant had the discretion manage the Bridge Creek Fire for WFU in accordance with guidelines and procedures as discussed above. None of the alleged violations raised by plaintiffs resulted in a mandate to alter WFU strategy from management of the Fire to suppression. Accordingly, defendant's motion should be granted in regard to the first prong of the discretionary function exception.

## VI. *Discretionary Function Exception Prong Two: Policy Considerations*

■ Prong two of the *Berkovitz* two-part test requires the Court to determine whether defendant's decision to categorize the Bridge Creek Fire for WFU, and subsequent management thereof, was susceptible to a policy analysis grounded in social, economic, or political concerns. "[S]o

long as a decision involves even two competing interests, it is susceptible to policy analysis and is thus protected by the discretionary function exception." *Bailey*, 623 F.3d at 863 (citation and internal quotations omitted). Defendant argues that the "Forest Service [initially decided to manage and thereafter] managed the Bridge Creek Fire based on policy considerations including ecological, economic, and social factors [such as] safety to firefighters, ecological effects and impacts on forest resources, danger to the public, and danger to private property." Def.'s Mem. in Supp. of Mot. Dismiss 16 (citation and internal quotations omitted).

Plaintiffs assert that, to the contrary, defendant's challenged actions were not based on considerations of public policy: "even assuming that [defendant] did not violate mandatory agency policy and procedures in managing the Bridge Creek Fire, [defendant's] implementation of those procedures fell far short of acceptable professional standards and, therefore, is not subject to a policy analysis." Pls.' Resp. to Mot. Dismiss 42. The gravamen of plaintiffs' argument is that "implementing a pre-existing plan is not a policy choice." Hearing Transcript at 71. In support of their argument, plaintiffs rely on *Marlys Bear Med. v. United States*, 241 F.3d 1208 (9th Cir.2001); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); and *Fl. Dep't of Agriculture & Consumer Servs. v. United States*, 2010 WL 3469353 (N.D.Fla. Aug. 30, 2010).[12] *See* Pls.' Resp. to Mot. Dismiss 39–40.

---

**12.** Aside from not being binding on this Court, *Fl. Dep't of Agriculture* is clearly distinguishable, as that court expressly did not decide whether the discretionary function exception applied because the government "ad-

mitted to not creating a sufficient Burn Plan." *Fl. Dep't of Agriculture*, 2010 WL 3469353 at *1–4. As such, as I stated at the hearing, *Fl. Dep't of Agriculture* is not persua-

Plaintiffs' arguments regarding "due care" and the "standard of care" are unavailing because negligence and/or an abuse of discretion are irrelevant to the discretionary function analysis. *See Kennewick,* 880 F.2d at 1029; *Terbush,* 516 F.3d at 1128. Further, "[t]he Ninth Circuit has not … adopted a blanket rule that all claims regarding the implementation of a chosen course of action are not protected." *Cleveland,* 546 F.Supp.2d at 765 (citations omitted). Rather, "implementation of a government policy is shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing firefighter safety and public safety considerations in deciding how to fight a fire." *Whisnant v. United States,* 400 F.3d 1177, 1182 n. 3 [13] (9th Cir. 2005); *Bailey,* 623 F.3d at 862 ("balancing competing safety considerations is a protected policy judgment") (citation omitted); *see also Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267 ("[w]hen established governmental policy[, in the form of] agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion").

For this reason, plaintiffs' reliance on *Marlys Bear,* for the proposition that, once undertaken, the implementation of safety measures does not involve policy considerations, is misplaced under the circumstances of this case. *See Marlys Bear,* 241 F.3d at 1215–16 (discretionary function exception did not apply where a member of the Blackfeet Tribe was fatally injured by

a falling tree due to the government's "failure to effectuate policy choices already made"); *see also Green,* 630 F.3d at 1251–52 ("[e]ven though the Forest Service retained discretion in fighting the Bullock Fire," the discretionary function exception did not apply because the government's failure to provide notice of an agency-created hazard, which directly caused the plaintiffs' injury, was not subject to a policy analysis). In addition, the Supreme Court precedent on which plaintiffs rely is unpersuasive. *Indian Towing* and *Rayonier* are cases from the 1950s that did not involve or discuss the discretionary function exception and predated the existing two-part test. Accordingly, both the Supreme Court and the Ninth Circuit have held that these cases are not controlling in this context. *See Manns v. United States,* 945 F.Supp. 1349, 1352 (D.Or.1996) (citing *United States v. Varig Airlines,* 467 U.S. 797, 812, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); and *Kennewick,* 880 F.2d at 1023); *Gaubert,* 499 U.S. at 326, 111 S.Ct. 1267; *Miller,* 163 F.3d at 596–97.

More importantly, plaintiffs' assertion that the challenged decisions were not susceptible to a policy analysis is belied by the language of the guidelines underlying this case and defendant's sworn statements. For instance, the Forest Service Manual states that the response to a WFU fire will be based on ecological, social, and legal consequences, firefighter and public safety, and natural and cultural resources. *See* Snell Decl. Ex. 1, at 9. The Forest Service Manual also emphasizes that managing

---

sive and the Court declines to address it further. *See* Hearing Transcript at 28–29.

**13.** Plaintiffs argue that the Court cannot rely on this footnote in *Whisnant,* which they characterize as "dicta." *See* Pls.' Resp. to Mot. Dismiss 41 n. 49. As the Ninth Circuit recently noted, this footnote is not dicta: "[it] merely contrasts *Whisnant's* holding by recognizing the holding of *Miller* … It also recog-

nizes that the holding of *Miller* did not apply to the facts in *Whisnant.*" *Bailey,* 623 F.3d at 862–63 n. 6. Here, defendant's decisions—i.e. when and whether to implement and cease WFU management—did require it to balance competing safety considerations. Thus, as was the case in *Bailey,* my decision today does not conflict with *Whisnant. Id.*

natural ignitions to benefit resources serves the economic and environmental interests of reducing "future fire suppression costs and unwanted effects," and the ecological objective of restoring natural processes. Martin Decl. Ex. B, at 17; *see also* Def.'s Mem. in Supp. of Mot. Dismiss Ex. 1, at 4. The Guides identify several public policy values that are assessed as part of WFU management, which include considerations of firefighter and public safety, effects on natural and cultural resources, and other ecological, social, and economic factors. *See, e.g.,* Walter Decl. Ex. A, at 10, 33; Walter Decl. Ex. H, at 4, 6, 14–17. Furthermore, the testimony of Queen, Walter, and Reidy indicates that their decisions in managing the Bridge Creek Fire were grounded in public policy considerations, such as the ecological benefit of a WFU Fire, the likelihood that the Fire would spread to and damage private property, the proximity to other valuable public resources, danger to the public and firefighter safety, and the allocation of resources between the Bridge Creek and other WFU fires burning within the Ochoco National Forest. *See* Queen Decl. ¶¶ 8, 11–12; Reidy Decl. ¶¶ 6–7; Walter Decl. ¶¶ 6–7, 13; *see also* Martin Decl. Ex. A, at 17; Walter Decl. Ex. E, 7–9.

Therefore, the Court finds that defendant's decisions regarding whether to manage the Bridge Creek Fire for WFU purposes, and how the management of the Fire would proceed, were susceptible to a policy analysis. These discretionary decisions were grounded in policy regarding management of naturally ignited fires in the wilderness and involved social, economic, and political concerns. Accordingly, the second prong of the discretionary function exception is met. As United States District Court Judge Michael Mosman observed, "both the Ninth Circuit and its lower courts have repeatedly applied the discretionary function exception to

similar cases." *Dovenberg,* 2009 WL 3756370 at *5 (citations omitted). This is because implementing forest fire management strategies involves both actual and implicit considerations of a plethora of public policy factors. *See generally* Walter Decl. Ex. A; Walter Decl. Ex. H; *see also Miller,* 163 F.3d at 596–97; *Dovenberg,* 2009 WL 3756370 at *4; *Backfire 2000 v. United States,* 273 Fed.Appx. 661, 662–63 (9th Cir.2008) (unpublished decision); *Pope & Talbot, Inc. v. Dep't of Agriculture,* 782 F.Supp. 1460, 1466–67 (D.Or.1991); *Defrees v. United States,* 738 F.Supp. 380, 385 (D.Or.1990); *Parsons v. United States,* 811 F.Supp. 1411, 1418–21 (E.D.Cal.1992).

In sum, during fire management and fire suppression, the situation faced by the Forest Service can vary widely depending on changing weather conditions, availability of personnel, equipment, and resources, the particular ecological traits of the forest, and a number of other factors. The Forest Service must be able to make timely fire-related decisions based on these policy considerations. Accordingly, while in hindsight it may be easy to say that defendant could have taken certain measures to prevent the spread of the Bridge Creek Fire onto plaintiffs' property, of which this Court offers no opinion, that is exactly the judicial second-guessing of government decision-making that the discretionary function exception is designed to prevent: "[o]ur task is not to determine whether the Forest Service made the correct decision in its allocation of resources. Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision." *Miller,* 163 F.3d at 596; *see also Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. Under the *Berkovitz* two-step approach, defendant demonstrated that its conduct was the result of a discretionary function susceptible to a poli-

**1234**

cy analysis, such that immunity applies. Thus, defendant's motion should be granted.

### RECOMMENDATION

For the foregoing reasons, defendant's motions to dismiss (docs. 13, 14) in these consolidated cases should be GRANTED and these cases should be DISMISSED.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 26, 2013. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 9th day of April, 2013.